## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

WINFRED WAIRIMU WAMAI, individually and on behalf of the Estate of Adam Titus Wamai; TITUS WAMAI; DIANA WILLIAMS; LLOYD WAMAI; ANGELA WAMAI; VELMA BONYO, individually and on behalf of the Estate of Wycliffe Ochieng Bonyo; DORINE BONYO; ELIJAH BONYO OCHIENG; ANGELA BONYO; WINNIE BONYO; BONIFACE CHEGE; CAROLINE WANJIRU GICHURU; LUCY GITAU, individually and on behalf of the Estate of Lawrence Ambrose Gitau; CATHERINE GITAU; FELISTER GITAU; ERNEST GITAU; CATHERINE GITUMBU KAMAU, individually and on behalf of the Estate of Joel Gitumbu Kamau; DAVID KAMAU; PETER KAMAU; PHILLIP KAMAU; HENRY BATHAZAR KESSY; FREDERICK KIBODYA; FLAVIA KIYANGA; LUCY KIONGO, individually and on behalf of the Estates of Joseph Kamau Kiongo and Teresia Wairimu Kamau; ALICE KIONGO; JANE KAMAU; NEWTON KAMAU; PETER KAMAU KIONGO; PAULINE KAMAU; HANNAH WAMBUI; PAULINE KAMAU KIONGO; MERCY WAIRUMU KAMAU; DANIEL KIONGO KAMAU; RAPHAEL KIVINDYO; MILKA WANGARI MACHARIA; SAMUEL PUSSY, individually and on behalf of the Estate of Rachael Mungasia Pussy; DOREEN PUSSY; ELSIE PUSSY; ANDREW PUSSY; MICHAEL NGIGI MWORIA; JOHN NDUATI; AARON MAKAU NDIVO; JOYCE MUTHEU; PRISCILA OKATCH, individually and on behalf of the Estate of Maurice Okatch Ogolla; JACKLINE ACHIENG; ROSEMARY ANYANGO OKATCH; SAMSON OGOLLA OKATCH; DENNIS OKATCH; PAULINE ABDALLAH; BELINDA AKINYI ADIKANYO; FAITH KIHATO, individually and on behalf of the Estate of Tony Kihato Irungu; JACQUELINE KIHATO; STEVE

Civil Action No. 21-CV-00325

**COMPLAINT**

**JURY TRIAL DEMAND**

KIHATO; ANNAH WANGECHI; BETTY KAGAI; ELSIE KAGIMBI; JOSINDA KATUMBA KAMAU, individually and on behalf of the Estate of Vincent Kamau Nyoike; CAROLINE WANJURI KAMAU; FAITH WANZA KAMAU; DAVID KIARIE KIBURU; GRACE KIMATA, individually and on behalf of the Estate of Francis Watoro Maina; VICTOR WATORO; LYDIA MURIKI MAYAKA, individually and on behalf of the Estate of Rachel Wambui Watoro; NYANGORO MAYAKA; DOREEN MAYAKA; DICK OBWORO MAYAKA; DIANA NYANGARA; DEBRA MAYAKA; GEORGE MAGAK MIMBA; TIBRUSS MINJA; EDWARD MWAE MUTHAMA; NICHOLAS MUTISO; SARAH TIKOLO, individually and on behalf of the Estate of Geoffrey Moses Namai; NIGEEL NAMAI; CHARLES MWANGI NDIBUI; JULIUS NZIVO; ROSEMARY OLEWE, individually and on behalf of the Estate of Francis Olewe Ochilo; JULIET OLEWE; WENDY OLEWE; PATRICK OKECH; MORDECHAI THOMAS ONONO, individually and on behalf of the Estate of Lucy Grace Onono; JOHN MURIUKI; EVITTA FRANCIS KWIMBERE; MARY OFISI; JOYCE ONYANGO, individually and on behalf of the Estate of Eric Abur Onyango; TILDA ABUR; BARNABAS ONYANGO; KELESENDHIA APONDI ONYANGO; PAUL ONYANGO; KAKA ABUBAKAR IDDI; CHARLES MWAKA MULWA; VICTOR MPOTO; JULIUS OGORO; MARY NDAMBUKI, individually and on behalf of the Estate of Kimeu Nzioka Nganga; WELLINGTON OLUOMA; JACINTA WAHOME; STELLA MBUGUA; SAJJAD GULAMAJI; MARY GITONGA; FRANCIS MAINA NDIBUI; KIRUMBA W'MBURU MUKURIA; CHRISTANT HIZA; MARINI KARIMA; ZEPHANIA MBOGE; EMILY MINAYO; JOASH OKINDO; RUKIA WANJIRU ALI; BERNARD MUTUNGA KASWII; HOSIANA MBAGA; MARGARET WAITHIRA NDUNGU; SAMUEL

ODHIAMBO ORIARO; GAUDENS
THOMAS KUNAMBI; LIVINGSTONE
BUSERA MADAHANA; MENELIK
KWAMIA MAKONNEN; TOBIAS OYANDA
OTIENO; CHARLES MWIRIGI
NKANATHA; JUSTINA MDOBILU;
GIDEON MARITIM; BELINDA CHAKA;
CLIFFORD TARIMO; JAMES NDEDA;
MILLY MIKALI AMDUSO; MOSES
KINYUA; VALERIE NAIR; AISHA
KAMBENGA, individually and on behalf of the
Estate of Bakari Nyumbu; JANE KATHUKA,
individually and on behalf of the Estate of
Geoffrey Kalio; BERNICE NDETI; DAWN
MULU; TABITHA KALIO; AQUILAS
KALIO; CATHERINE KALIO; LILIAN
KALIO; HUSSEIN RAMADHANI,
individually and on behalf of the Estate of
Ramadhani Mahundi; CHARLES MUNGOMA
OLAMBO; CAROLINE OKECH; ENOS
NZALWA; ALI HUSSEIN ALI, individually
and on behalf of the Estate of Hindu Omari Idi;
OMAR IDI; HAMIDA IDI; MAHAMUD
OMARI IDI; RASHID OMAR IDI; FATUMA
OMAR; KAMALI MUSYOKA KITHUVA,
individually and on behalf of the Estate of
Dominic Musyoka Kithuva; BEATRICE
MARTHA KITHUVA; TITUS KYALO
MUSYOKA; BENSON MALUSI
MUSYOKA; CAROLINE KASUNGO
MGALI; MONICA WANGARI MUNYORI;
NURI HAMISI SULTANI, individually and on
behalf of the Estate of Mohamed Abdallah
Mnyolya; NAFISA MALIK; GRACE
MAKASI PAUL, individually and on behalf of
the Estate of Eliya Elisha Paul; BLASIO
KUBAI; ELIZABETH MALOBA, individually
and on behalf of the Estate of Frederick Maloba;
MARGARET MALOBA; LEWIS MALOBA;
MARLON MALOBA; SHARON MALOBA;
KENNETH MALOBA; EDWINA OWUOR,
individually and on behalf of the Estate of
Josiah Owuor; VINCENT OWUOR;
WARREN OWUOR; GRACE GICHO,
individually and on behalf of the Estate of Peter
Macharia; DIANA MACHARIA; NGUGI

MACHARIA; MARGARET NJOKI NGUGI;
JOHN NGUGI ANN RUGURU; DAVID
NGUGI; PAUL NGUGI; STANLEY NGUGI;
LUCY CHEGE; MARGARET GITAU;
SUSAN GITAU; PERIS GITUMBU; STACY
WAITHERE; MONICAH KAMAU; JOAN
KAMAU; MARGARET NZOMO; BARBARA
MULI; STEPHEN MULI; LYDIA NDIVO
MAKAU; SARAH MBOGO, individually and
on behalf of the Estate of Francis Mbogo
Njung'e; MISHECK MBOGO; ISAAC
KARIUKI MBOGO; REUBEN NYAGA
MBOGO; NANCY MBOGO; EPHANTUS
NJAGI MBOGO; STEPHEN NJUKI MBOGO;
ANN MBOGO; NEPHAT KIMATHI
MBOGO; DANIEL OWITI OLOO;
MAGDALINE OWITI; BENSON BWAKU;
BEATRICE BWAKU; JOTHAM GODIA;
GRACE GODIA; HANNAH NGENDA
KAMAU; DUNCAN NYOIKE KAMAU;
CHRISTINE MIKALI KAMAU; RUTH
NDUTA KAMAU; MERCY WANJIRU;
STANLEY NYOIKE; JENNIFER NJERI;
ANTHONY NJOROGE; SIMON NGUGI;
MICHAEL IKONYE KIARIE; JANE
IKONYE KIARIE; SAMMY NDUNGU
KIARIE; ELIZABETH KIATO; CHARITY
KIATO; JUDY KIARIE; NANCY MIMBA
MAGAK; RAPHAEL PETER MUNGUTI;
MARY MUNGUTI; ANGELA MWONGELI
MUTISO; BENSON NDEGWA; PHOEBA
NDEGWA; MARGARET MWANGI NDIBUI;
CAROLINE NGUGI KAMAU; CHARLES
OLEWE; PHELISTER OKECH; ESTATE OF
PHAEDRA VRONTAMITIS; LEONIDAS
VRONTAMITIS; ALEXANDER
VRONTAMITIS; PAUL VRONTAMITIS;
ANASTASIA GIANPOULOS; JOHN OFISI;
KATHERINE MWAKA; EUCABETH
GWARO; TRUSHA PATEL; PANKAJ
PATEL; MARY MUDECHE; MICHAEL
WARE; SAMMY MWANGI; LUCY
MWANGI; JOSEPH WAHOME; SOLOMON
MBUGUA; JAPETH GODIA; MERAB
GODIA; WINFRED MAINA; JOMO
MATIKO BOKE; SELINA BOKE;

HUMPHREY KIBURU; JENNIFER WAMBAI; HARRISON KIMANI; GRACE KIMANI; ELIZABETH MULI-KIBUE; HUDSON CHORE; LYDIA NYABOKA OTAO OKINDO; STANLEY KINYUA MACHARIA; NANCY MACHARIA; BETTY ORIARO; RACHEL OYANDA OTIENO; HILARIO AMBROSE FERNANDES; CATHERINE MWANGI; DOREEN OPORT; PHILEMON OPORT; GERALD BOCHART; YVONNE BOCHART; LEILANI BOWER; MURABA CHAKA; ROSELYN NDEDA; JAMES MUKABI; FLORENCE OMORI; individually and on behalf of the Estate of Edwin Omori; BRYAN OMORI; JERRY OMORI; JANATHAN OKECH; MARY MUTHONI NDUNGU, individually and on behalf of the Estate of Francis Ndungu Mbugua; SAMUEL MBUGUA NDUNGU; JAMLECK GITAU NDUNGU; JOHN MUIRU NDUNGU; EDITH NJERI; ANNASTACIAH LUCY BOULDEN; AGNES WANJIKU NDUNGU; FAITH MALOBA; DERRICK MALOBA; STEVEN MALOBA; BELINDA MALOBA; CHARLES OCHOLA; RAEL OCHOLA; JULIANA ONYANGO; MARITA ONYANGO; MARY ONSONGO, individually and on behalf of the Estate of Evans Onsongo; ENOCH ONSONGO; PERIS ONSONGO; VENICE ONSONGO; SALOME ONSONGO; BERNARD ONSONGO; GEORGE ONSONGO; EDWIN ONSONGO; GLADYS ONSONGO; PININA ONSONGO; and IRENE KUNG'U

Plaintiffs,

v.

INDUSTRIAL BANK OF KOREA,

Defendant.

## INTRODUCTION

1.      In 2011, the Islamic Republic of Iran engaged in a scheme by which proceeds of sales of Iranian commodities, particularly oil, to South Korea were transferred to the Industrial Bank of Korea ("IBK") with the goal of converting Korean won ("KRW") denominated funds held in a restricted account belonging to the Central Bank of Iran at IBK to U.S. currency and funneling those funds into the U.S. financial markets in secret—thereby evading U.S. sanctions and depriving Iran's judgment creditors of hundreds of millions of dollars in recovery.

2.      Iran's evasion of U.S. sanctions was orchestrated through the transfer of approximately one billion dollars' worth of funds to and through IBK's New York branch ("IBKNY") in bad faith, by falsifying documents and business relationships to enable the transfer of otherwise-restricted Iranian funds in the Central Bank of Iran's account at IBK to other participants in the fraudulent scheme, in the hope of evading U.S. sanctions.  The transfers at issue were made while Plaintiffs—the victims of acts of terrorism sponsored by Iran—had cases pending against Iran, which resulted in judgments totaling approximately $5.5 billion.  To date, Plaintiffs' judgments have not been satisfied by Iran.

3.      Transfers of Iran's funds were made with knowledge of Plaintiffs' lawsuits and with the intent of circumventing judgments in those cases and U.S. laws designed to capture Iranian funds, including funds that, had the true beneficiary of which been disclosed, could have been subject to attachment and seizure by Plaintiffs and other victims of Iranian-sponsored terrorism.

4.      Iran is the world's leading sponsor of terrorism and an unrepentant judgment debtor.  It owes approximately $5.5 billion to the Plaintiffs, all of whom are victims of terrorism and their families, whose lives were forever altered by the 1998 al Qaeda bombings on the U.S.

embassies in Tanzania and Kenya (the "Embassy Bombings").  When the bombs were detonated and murders carried out in Tanzania and Kenya, their bodies and futures were shattered, resulting in indelible physical, emotional and psychological devastation.

5. The U.S. District Court for the District of Columbia (the "D.C. District Court") has determined on multiple occasions that Iran is liable to these victims for their suffering.

6. After prolonged litigation, the D.C. District Court determined in 2011 that al Qaeda could not have carried out the Embassy Bombings without Iran's support and sponsorship, and that the "[s]upport from Iran and Hezbollah" in particular "was critical to al Qaeda's execution of the 1998 embassy bombings."  As a result of Iran's sponsorship of al Qaeda's terrorism, the court held Iran liable to Plaintiffs for a total of $5.5 billion in 2014.  But in the six years since the court issued these judgments against Iran, despite dogged pursuit by its judgment creditors, Iran has not paid one dime towards the judgments.

7. Iran remains one of the world's biggest economies, with its gross domestic product amounting to over $1 trillion, billions of which pass through the international financial markets, including the U.S. financial markets, each year.  If detected in the U.S. financial system, however, Iran's assets could have been used to satisfy Plaintiffs more than $5 billion judgments.  Having litigated against U.S. judgment creditors—who have sought for decades to enforce their judgments for Iran's support of terrorism resulting in their injuries—Iran was well-aware of the danger that its funds would be seized by judgment creditors such as Plaintiffs unless elaborate subterfuge was successfully employed.

8. To evade detection and its debts to terror victims like the Plaintiffs, Iran and its agents worked with IBK to develop a fraudulent conveyance scheme involving complex, fraudulent transactions that masked the flow of funds that Iran caused to be transferred to a

restricted account at IBK into and out of the U.S. financial markets, and the New York banking system.  Through these fraudulent transactions, Iran transferred or caused to be transferred over $1 billion worth of its funds to and through its bank account at IBK to Korean entities' accounts within IBK and eventually through IBK's correspondent accounts at IBKNY.  These transfers were made possible through an agreement between Iran, its agents, and senior officials at IBK that IBK would authorize the transfers, which were based entirely on fake documents and sham transactions, to go forward, and that IBK would knowingly execute subsequent transfers through its U.S. correspondent branch for the benefit of Iran.

9.       Pursuant to this carefully calculated deception, between February 2011 and at least July 2011, approximately $1 billion worth of Iranian assets were fraudulently conveyed to accounts at IBK and then transferred onwards into the United States and elsewhere without risk of execution by Plaintiffs.  Not only did this allow Iran to evade its debts to Plaintiffs, it also allowed Iran to circumvent the U.S. Iranian sanctions regime, which was designed and implemented specifically to exclude Iran from the U.S. financial system and capital markets.  Indeed, in order to successfully execute this fraud, IBK flouted U.S. banking regulations and intentionally withheld information from U.S. regulators on behalf of Iran.

10.      Each transfer to IBK and ultimately through IBKNY was a fraudulent conveyance designed to allow Iran to evade its judgment creditors.  These transactions resulted in asset and capital transfers that were not exchanged for equivalent value.  In addition, each transaction was effectuated without fair consideration, as they were not made on a good faith basis since each transaction was specifically intended to evade or circumvent Iran's obligations under U.S. law.

11.      Iran's fraudulent conveyances cannot stand under New York law.  Iran was a defendant in multiple lawsuits that ultimately resulted in judgments totaling more than $5 billion

in favor of Plaintiffs when Iran schemed to funnel assets to IBK and into the United States without detection by Plaintiffs. The fraudulent transfers and conveyances must be undone, and the assets must be turned over to Plaintiffs, to compensate these long-suffering victims of terrorism in compliance with New York law.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs seek relief under federal law, namely the Terrorism Risk Insurance Act ("TRIA"). Plaintiffs' lawsuit necessarily raises issues of federal law, including Plaintiffs' entitlement to relief under TRIA. In addition, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(11) because this action is a mass action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), involving monetary relief claims of over 100 plaintiffs that are proposed to be tried jointly on the ground that the claims involve common questions of law and fact.

13. This Court has personal jurisdiction over IBK pursuant to Federal Rule of Civil Procedure 4(k)(1)(A), which permits this Court to exercise personal jurisdiction to the extent allowed by New York statutes. New York's C.P.L.R. § 302 provides jurisdiction over IBK because it transacted business in New York by maintaining a branch bank as well as correspondent accounts at financial institutions located in New York through which Iran transferred funds as part of its fraudulent scheme. Further, IBK knowingly initiated transactions to be completed in U.S. dollars routed through IBK's New York-based correspondent accounts to complete the fraudulent scheme, as directed by Iran. This Court also has personal jurisdiction over IBK under C.P.L.R. § 302(a)(1) because IBK executed its scheme through its agents, each of whom purposefully directed their actions to the U.S. financial system, including financial institutions in New York.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of New York.

## THE PARTIES

15.     Plaintiffs are 323 individuals who are direct victims and surviving family members of the Embassy Bombings, which were carried out with the critical material support of the Iranian government.

16.     Plaintiffs include U.S. citizens and Kenyan and Tanzanian nationals who were employed by the U.S. embassies and on duty during the Embassy Bombings, and/or their families. These individuals, and their family members, have suffered severe physical and psychological injuries, including loss of life, loss of limbs, permanent disabilities, physiological trauma, and devastating and debilitating emotional distress.

17.     Defendant IBK is a foreign financial institution organized under the laws of, and headquartered in, Seoul, South Korea.  IBK was established in 1961 pursuant to the Industrial Bank of Korea Act, and the South Korean government currently owns approximately 59% of IBK.[1] IBK utilizes correspondent bank accounts all over the world and operates a New York State-licensed branch in New York, New York.[2]

---

[1]  *See* FDIC, Industrial Bank of Korea Resolution Plan for U.S. Operations Public Section at 1 (Dec. 31, 2018), *available at* https://www.fdic.gov/regulations/reform/resplans/plans/ibk-165-1812.pdf; *Corporate Governance*, Industrial Bank of Korea, https://global.ibk.co.kr/en/company/Coporate; *Shareholder Status*, Industrial Bank of Korea, https://global.ibk.co.kr/en/investor/StatusofShareholders

[2]  *See supra* n.1, https://www.fdic.gov/regulations/reform/resplans/plans/ibk-165-1812.pdf.

18.     At the end of 2019, IBK reported approximately $264 billion in assets.  IBK's total income for 2019 was approximately $1.85 billion, and IBK reported legal reserves in excess of $2.8 billion.

19.     In April 2020, the U.S. Attorney's Office for the Southern District of New York ("SDNY"), New York Attorney General's Office ("NYAG"), and New York State Department of Financial Services ("NYDFS") announced the resolution of investigations into the IBK in connection with its role in the scheme by which Iran was able to transfer approximately $1 billion through IBK accounts in violation of U.S. prohibitions against Iran.[3]  As part of the resolution, IBK is required to pay a combined $86 million and has entered into a Deferred Prosecution Agreement with the SDNY U.S. Attorney's Office, a Non-Prosecution Agreement with the NYAG, and a Consent Order with the NYDFS.

## FACTUAL ALLEGATIONS

## I.     Iran Owes $5.5 Billion To Plaintiffs

### A.     The Embassy Bombings

20.     In 1998, al Qaeda carried out the Embassy Bombings, which were simultaneous suicide bombings on the U.S. embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya.

21.     Iran and the Republic of Sudan, which is not a party to this action, deliberately provided material support to al Qaeda's planning, recruitment, and training activities to help it carry out the Embassy Bombings.

---

[3]   *See* N.Y. Attorney General, *Attorney General James Announces Agreement with Industrial Bank of Korea Related to Illegal Transfer of Over $1 Billion to Iran* (Apr. 20, 2020), https://ag.ny.gov/press-release/2020/attorney-general-james-announces-agreement-industrial-bank-korea-related-illegal.

22.     During the Embassy Bombings, 224 people were killed and more than 5,000 were wounded.[4]   The 323 Plaintiffs are among those injured and family members of those injured or killed.

### B.     *The Embassy Bombings D.C. District Court Actions*

23.     On August 5, 2008, two suits were filed against Iran pursuant to 28 U.S.C. § 1605A of the Foreign Sovereign Immunities Act ("FSIA") for its role in the Embassy Bombings.[5]

24.     The *Amduso* suit was filed by Milly Mikali Amduso, who was injured in the Embassy Bombings, and ultimately included one hundred and thirteen (113) plaintiffs seeking justice from Iran and the Republic of Sudan.  On June 26, 2009, the *Amduso* plaintiffs successfully completed service of process on Iran.[6]   Iran was thus on notice in 2009 of the *Amduso* plaintiffs' action against it.  Iran failed to respond and defaulted later that year.[7]

25.     The *Wamai* suit was filed by Winfred Wairimu Wamai, individually and as a representative of the estate of Adam Titus Wamai, who was murdered in the Embassy Bombings, and ultimately included one hundred and ninety-six (196) plaintiffs seeking justice from Iran and the Republic of Sudan.  On February 14, 2009, April 22, 2009, and November 18, 2009, the *Wamai*

---

[4]  *See    1998    Embassy    Bombings    Fast    Facts*,    CNN    (Aug.    13,    2019), https://www.cnn.com/2013/10/06/world/africa/africa-embassy-bombings-fast-facts/index.html.

[5]  *See generally Amduso v. Republic of Sudan*, No. 08-01361 (D.D.C.) ("*Amduso* Suit"); *Wamai v. Republic of Sudan*, No. 08-01349 (D.D.C.) ("*Wamai* Suit").

[6]  *Amduso* Suit Dkt. 33; Dkt. 63 at 4.

[7]  *Amduso* Suit Dkt. 40; Dkt. 63 at 4.

plaintiffs successfully completed service of process on Iran.[8]  Iran was thus on notice in 2009 of the *Wamai* plaintiffs' action against it.  Iran failed to respond and defaulted in June 2010.[9]

26.    Another suit followed on August 7, 2008, which was brought by Mary Onsongo, individually and on behalf of the estate of Evans Onsongo, who was murdered in the Embassy Bombings, and ultimately included fourteen (14) plaintiffs seeking justice from Iran and the Republic of Sudan.[10]  On February 14, 2009 and November 18, 2009, the *Onsongo* plaintiffs successfully completed service of process on Iran.[11]  Iran was thus on notice in 2009 of the *Onsongo* plaintiffs' action against it.  Iran failed to respond and defaulted in June 2010.[12]

27.    In accordance with the FSIA, the D.C. District Court held a consolidated "three-day hearing on liability and damages," during which Plaintiffs from all three actions independently "established their claims 'by evidence satisfactory to the court.'"[13]  Based on the record before it, the D.C. District Court found Iran "liable for damages suffered by the plaintiffs" because the country "provided material aid and support to al Qaeda [operatives]."[14]  Specifically, "[t]he Iranian defendants, through Hezbollah, provided explosives training to Bin Laden and al Qaeda and rendered direct assistance to al Qaeda operatives."[15]  That "[s]upport from Iran and Hezbollah,"

---

[8]   *Wamai* Suit Dkts. 15, 23, 29; Dkt. 55 at 4.

[9]   *Wamai* Suit Dkts. 34, 35; Dkt. 55 at 4.

[10]   *See generally Onsongo v. Sudan*, No. 08-1380 (D.D.C.) ("*Onsongo* Suit").

[11]   *Onsongo* Suit Dkts. 8, 17; Dkt. 42 at 5.

[12]   *Onsongo* Suit Dkts. 21, 22, 23; Dkt. 42 at 5.

[13]   *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 134-35 (D.D.C. 2011) (quoting 28 U.S.C. § 1608(e)).

[14]   *Id.* at 135, 139.

[15]   *Id.* at 135.

the D.C. District Court concluded, "was critical to al Qaeda's execution of the 1998 embassy bombings."[16]

28.     The court then referred the cases to special masters to calculate damages.  Based on their calculations, on July 25, 2014, the court awarded $1,755,878,431.22 to the *Amduso* plaintiffs; $3,566,104,489.58 to the *Wamai* plaintiffs; and $199,106,578.19 to the *Onsongo* plaintiffs.[17]

29.     Notices of the *Amduso*, *Wamai*, and *Onsongo* judgments were served on Iran, in accordance with the FSIA, on January 31, 2016.[18]

30.     Iran is jointly and severally liable for the entire amount of the judgments, but has not paid one cent to satisfy them.  The judgments presently remain wholly unsatisfied.

31.     On July 28, 2014, the *Amduso*, *Wamai*, and *Onsongo* plaintiffs registered their judgments in the United States District Court for the Southern District of New York.[19]

32.     Plaintiffs have sought for years to compel Iran to satisfy their respective judgments, but Iran has successfully evaded pursuit from Plaintiffs and the many other victims of terrorism to whom it is liable under U.S. law.  Indeed, Iran has nothing but disdain for U.S. courts, denouncing U.S. court rulings against the country as "theft."[20]  Iran's fraudulent scheme to transfer assets to

---

[16]  *Id.* at 139.

[17]  *See Amduso* Suit Dkt. 254; *Wamai* Suit Dkt. 245; *Onsongo* Suit Dkt. 231.

[18]  *See Amduso* Suit Dkt. 303; *Wamai* Suit Dkt. 277; *Onsongo* Suit Dkt. 265.

[19]  *See Amduso v. Republic of Sudan*, No. 14-mc-00233 (SDNY July 29, 2014); *Wamai v. Republic of Sudan*, No. 14-mc-00232 (SDNY July 29, 2014); *Onsongo v. Republic of Sudan*, No. 14-mc-00230 (SDNY July 29, 2014).

[20]  *See, e.g.*, *Iran denounces U.S. ruling awarding Iran money to bomb victims: TV*, Reuters (Apr. 21, 2016), https://www.reuters.com/article/us-usa-court-iran-reaction-idUSKCN0XI214?feedType=RSS&feedName=worldNews.

and through IBK using phony transactions and fake documents was part of Iran's efforts to avoid paying its lawful debts.

II.   **To Avoid Paying Its Debts, Iran Has Disguised Its Involvement In The U.S. Financial Markets**

33.    Plaintiffs are entitled to execute on Iranian assets in the United States under both federal and New York law in order to satisfy their judgments.  Their ability to do so, however, turns on their ability to locate Iranian assets within the United States, which have been intentionally obfuscated by Iran and IBK in order to avoid detection.

*A.    Plaintiffs Are Entitled To Execute On Iranian Assets Located In The United States*

34.    Federal Rule 69(a) of the Federal Rules of Civil Procedure allows Plaintiffs to employ New York's judgment enforcement procedures except to the extent federal law applies.

35.    New York law permits a judgment creditor to seek a turnover order requiring (1) a "person in possession or custody of money . . . in which the judgment debtor has an interest," or (2) a "person who is a transferee of money . . . from the judgment debtor" to pay that money to the judgment creditor, "or so much of it as is sufficient to satisfy the judgment."  C.P.L.R. § 5225.

36.    The FSIA also enables Plaintiffs to execute on Iranian assets in the United States where the assets are "used for a commercial activity in the United States."  28 U.S.C. § 1610(a). In fact, because Plaintiffs are the victims of terrorist acts, the FSIA allows Plaintiffs to execute on not only Iran's property, but also property owned by any of its agencies or instrumentalities.  *See* 28 U.S.C. § 1610(g).

37.    In addition, TRIA enables plaintiffs who have "obtained a judgment against a terrorist party on a claim based on an act of terrorism" to execute or attach in the aid of execution "the blocked assets of that terrorist party (including the blocked assets of any agency or

instrumentality of that terrorist party) . . . in order to satisfy such judgment." TRIA § 201(a), Pub. L. 107-297, 116 Stat. 2322, 2340 (Nov. 26, 2002).

38.     Plaintiffs are entitled to execute against Iran's assets under each of these provisions, including those assets held by or controlled by IBK.  The assets that Iran and IBK funneled into and out of the U.S. financial system all belong to Iran or its agency, instrumentality, and alter ego, the Central Bank of Iran—which is liable for Iran's terrorism judgments as a matter of federal law. Once the Iranian assets were secreted into New York, they were used for commercial purposes, including effectuating U.S. dollar-denominated transactions.  And had they been detected as assets of Iran or its agent and instrumentality—as they would have absent IBK's efforts to obscure the true nature of the initial, underlying transactions, and the larger fraudulent scheme—they could have been subject to execution by Plaintiffs.

> **B.     To Evade Plaintiffs, Iran And IBK Also Had To Circumvent The U.S. Sanctions Regime**

39.     U.S. law prohibits any U.S. person, including financial institutions inside the United States, from providing services directly or indirectly to Iran or the Government of Iran, in the absence of a license from the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC").  This prohibition includes the unlicensed processing of transactions through U.S. banks that are for the benefit of the Government of Iran, including any agency or instrumentality of the Government of Iran or any entity owned or controlled by the Government of Iran.  The Central Bank of Iran is part of the Government of Iran and has been identified by OFAC as an entity owned or controlled by the Government of Iran since prior to 2000.

40.     The International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1701, *et seq*. authorizes the President of the United States "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the

United States, to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, including the authority to "investigate, regulate, or prohibit . . . any transactions in foreign exchange," "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof," and "the importing or exporting of currency or securities by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(A).

41.     Starting in 1979 with Executive Order No. 12170, the U.S. government imposed a series of sanctions on Iran to address the "unusual and extraordinary threat to the national security, foreign policy and economy of the United States" created by the "situation in Iran" and "declare[d] a national emergency to deal with that threat."  Subsequently, on March 15 and May 6, 1995, Executive Orders Nos. 12957 and 12959 were issued, which prohibited, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.  On August 19, 1997, Executive Order No. 13059 was issued, which clarified the previous orders and authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry them out. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (the "ITR") implementing the sanctions imposed by the Executive Orders.  *See* 31 C.F.R. § 560.201, *et seq.*[21]

---

[21]  On October 22, 2012, OFAC changed the heading of the "Iranian Transactions Regulations" to the "Iranian Transactions and Sanctions Regulations," amended the renamed ITSR, and reissued them in their entirety.  The prohibited activities set forth herein were in effect under the ITR and remain in full force and effect under the ITSR.

42.     The ITR prohibited financial institutions and other U.S. persons from engaging in transactions with the Government of Iran.  Under those rules, U.S. financial institutions receiving instructions to execute transactions involving those entities were required to reject those instructions rather than carry them out, unless the transactions were exempt, authorized, or not prohibited by OFAC.[22]

43.     The ITR imposed, among others, the following prohibitions:

**Section 560.203 – Evasions; attempts.**

> Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

**Section 560.204 – Prohibited exportation, reexportation, sale or supply of goods, technology, or services to Iran.**

> Except as otherwise authorized [by OFAC] . . . , the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:
>
> (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or
>
> (b) Such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

**Section 560.206 – Prohibited trade-related transactions with Iran; goods, technology, or services.**

> (a) Except as otherwise authorized pursuant to this part . . . no United States person, wherever located, may engage in any transaction or dealing in or related to:

---

[22]   *See* OFAC FAQs: Iran Sanctions 160, U.S. Dep't of the Treasury, https://home.treasury.gov/policy-issues/financial-sanctions/faqs/topic/1551.

13

(1) Goods or services of Iranian origin or owned or controlled by the Government of Iran; or

(2) Goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran.

(b) For purposes of paragraph (a) of this section, the term transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing.

**Section 560.208 – Prohibited facilitation by United States persons of transactions by foreign persons.**

Except as otherwise authorized [by OFAC] . . . , no United States person, wherever located, may approve, finance, facilitate, or guarantee any transaction by a foreign person where the transaction by that foreign person would be prohibited by this part if performed by a United States person or within the United States.

44.     On July 1, 2010, President Obama signed into law the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA"). *See* 28 U.S.C. §§ 8501–8551, Pub. L. No. 111-195 (July 1, 2010). CISADA strengthened then-existing U.S. sanctions with respect to the Iranian energy industry and added the potential for the imposition of serious limits on foreign financial institutions' access to the U.S. financial system if they engage in certain transactions involving Iran. Specifically, CISADA authorized the imposition of sanctions against foreign financial institutions that engaged in transactions either facilitating Iran's nuclear or ballistic missiles programs, or with persons and entities designated under United Nations and U.S. sanctions against terrorism and weapons of mass destruction proliferation.

45.     On August 16, 2010, OFAC issued the Iranian Financial Sanctions Regulations ("IFSR") in order to implement provisions of the CISADA.[23] Any foreign financial institution that knowingly facilitates significant transactions or provides significant financial services for a

---

[23]  OFAC has since amended the IFSR.

U.S.-designated, Iranian-linked financial institution can be sanctioned under section 104(c) of CISADA and section 561.201 of the Iranian Financial Sanctions Regulations.

46.     In response to these sanctions as well as additional restrictions imposed by the U.S. government over time, Iran reacted with defiance and devoted substantial efforts to circumvent these measures.  For example, Iran's Supreme Leader Ayatollah Khamenei declared the year 2011 to be the year of "economic jihad," as the country aimed to revive the Iranian economy and reverse the impact of Iran's increasing isolation from the global economy.[24]  In 2014, the Iranian President stated, "[o]f course, we bypass sanctions.  We are proud that we bypass sanctions because the sanctions are illegal."[25]  And, Iran has proclaimed that it has "Ph.D. in sanctions busting,"[26] that "all possible options have been planned in government to counter sanctions,"[27] and that it has "perfected . . . the art of evading sanctions."[28]

### C.     The CBI Won Accounts

47.     Throughout the years relevant to this Action, the Government of South Korea maintained a trade relationship with the Government of Iran.[29]   In September 2010, IBK

---

[24]  Richard Javad Heydarian, *Dissecting Iran's Economic Jihad*, Foreign Policy In Focus (July 28, 2011), https://fpif.org/dissecting_irans_economic_jihad/.

[25]  *Iran President Rouhani hits out at US sanctions*, BBC News (Aug. 20, 2014), https://www.bbc.com/news/world-middle-east-28997452.

[26]  Dan De Luce, *Trump pressure will fail because Iran has a 'Ph.D in sanctions busting,' says Iran's Zarif*, NBC News (Apr. 25, 2019), https://www.nbcnews.com/news/world/trump-pressure-will-fail-because-iran-has-ph-d-sanctions-n998711.

[27]  *Iran pledges to counter "malicious" oil embargo*, Reuters (July 1, 2020), https://in.reuters.com/article/iran-sanctions/iran-pledges-to-counter-malicious-oil-embargo-idINL6E8I106C20120701.

[28]  Tom Gara, *Iran's Foreign Minister Says It's Impossible For Iran To Repress Its Own People*, BuzzFeed News (Dec. 15, 2018), https://www.buzzfeednews.com/article/tomgara/javad-zarif-iran-dodge-us-sanctions-doha-forum.

[29]  *See* I-wei Jennifer Chang, *The Iran Sanctions and South Korea's Balancing Act*, Middle East Institute (June 2, 2014), https://www.mei.edu/publications/iran-sanctions-and-south-koreas-balancing-act#_ftnref14.

established restricted and controlled KRW-denominated accounts belonging to the Central Bank of Iran (the "CBI Won Accounts"). Iran directed South Korean entities to pay for purchases of Iranian commodities by depositing Korean won into the Iranian accounts at Korean banks knowing that because of its fraudulent scheme, it would be able to transfer funds out of IBK in violation of U.S. Sanctions.

48.     The CBI Won Accounts were supposed to be subject to certain restrictions, including, among other things, that the accounts could only be used for transactions involving certain permissible goods, such as Iranian oil; to compensate Korean businesses who were owed compensation from Iran for certain types of limited and permissible commercial trade and sales actions; and could not involve transactions with or in U.S. Dollars. Iran caused funds to be transferred to IBK in bad faith knowing that IBK would allow those restrictions to be violated.

49.     Transfer of the KRW-denominated Iranian funds from the CBI Won Accounts into the worldwide financial market was controlled by the Korean government, such that payments for Korean commodities were only authorized from the CBI Won Accounts after a multi-step review process had been undertaken. That process involved the Korean government, the Bank of Korea, and the bank where the account was located, *i.e.*, IBK, and required the entities to examine the applicable business documentation, such as contracts, import/export documents, purchase orders and bills of lading, relating to the proposed transactions. Iran and IBK deliberately thwarted this process through the use of fake transactions and fraudulent documents.

### D.     *IBK Received Iranian Assets As Part of Iran's Fraud On Plaintiffs And The U.S. Financial System*

50.     As a result of U.S. sanctions, Iran knew that any transactions involving its funds would be rejected the moment they were received by U.S. financial systems. Therefore, Iran sought to partner with a foreign financial institution that would disguise its asset flows into and

out of financial systems around the world, including the United States, thereby avoiding the sanctions regime intended to block such movement. Iran ultimately chose to transfer its assets to IBK.

51. IBK willfully joined a fraudulent scheme orchestrated by Iran to evade the IEEPA and ITR, by using the CBI Won Account at IBK to accept and launder funds belonging to Iran. IBK converted Iranian KRW payments into USD so that they could be—and were—transferred to individuals and entities around the world, including the United States, using IBK's New York correspondent accounts.

### 1.    The Zong-Iranian Scheme

52. Between February and July 2011, Iran together with its agents, transferred or caused to be transferred $1,004,662,911.57 worth of Iranian funds to the CBI Won Account at IBK and from Iran's CBI Won Account to other accounts at IBK. The funds were then transferred to IBK's USD correspondent accounts in New York and from there funds were transferred to other accounts around the world, including the United States. These transfers were in violation of U.S. sanctions laws.

53. By or around early 2011, a U.S. citizen and businessman named Kenneth Zong, who operated a business purporting to export goods to Iran, set up shell companies in Korea, Iran, and elsewhere, which engaged in sham business transactions with Iranian and other third country entities to facilitate the transfer of Iranian funds from the CBI Won Accounts to Korean entities' accounts, the conversion of the funds into USD, and the subsequent transfer of the USD funds to other IBK accounts controlled by participants in the scheme.

54. Key participants in the Zong-Iranian Scheme included three Iranian nationals, Pourya Nayebi, Houshang Hosseinpour, and Houshang Farsoudeh, who were operating in the service of the Government of Iran, and have since been designated by the U.S. Treasury

Department as "Foreign Sanctions Evaders."[30]

55.     For their services in facilitating the illegal transactions, Zong and the other Iranian participants were rewarded with millions of dollars in compensation.

56.     Zong personally received approximately $10 million USD as compensation for his work, which was distributed to and laundered by his family members in the United States.  Those funds later became the subject of a civil forfeiture action brought by the U.S. Attorney's Office for the District of Alaska.[31]

57.     Zong's activities also led to his indictment in January 2013 by the Seoul Central District Prosecutor's Office in connection with the scheme and in December 2016 by the U.S. Attorney's Office in the District of Alaska for money laundering and other charges related to the scheme, including conspiracy to violate IEEPA and unlawful provision of services to Iran.  *U.S. v. Zong*, No. 3:16-cr-142 (D. Alaska Dec. 14, 2016).

58.     Pursuant to the Zong-Iranian Scheme, Zong and his Iranian co-conspirators set up a complex structure of fraudulent business relationships using Zong's companies and Iranian controlled companies, supported by false business documents, such as contracts, invoices, bills of lading, product documentation, and other written statements, to transfer Iranian government funds to Korean entities' IBK accounts from the CBI Won Account at IBK.

59.     The Iranian co-conspirators set up multiple front companies in Iran, U.A.E., Turkey, Georgia, Lichtenstein, New Zealand, and other countries to conduct business on behalf of

---

[30]   *See* U.S. Dep't of the Treasury, *Treasury Targets Networks Linked to Iran* (Feb. 6, 2014), https://www.treasury.gov/press-center/press-releases/pages/jl2287.aspx; *see also* Zach Dorfman, *The Ayatollah's Billion-Dollar Alaskan Bag Man*, Politico (July 14, 2017), https://www.politico.com/magazine/story/2017/07/14/iran-money-laundering-kenneth-zong-215372.

[31]   *See U.S. v. Real Property Located at 11621 Alderwood Loop, Anchorage, Alaska*, No. 3:14-cv-65 (D. Alaska May 2, 2014) (hereinafter "Zong Forfeiture Action").

the Government of Iran in furtherance of the Zong-Iranian Scheme.  These included two companies owned by Nayebi, Orchidea Gulf Trading Inc. ("Orchidea") and MSL & Co Investment Trading (MSL Investment Dubai) ("MSL").  MSL documents identify Orchidea as a "sister company" of MSL, and Zong has identified Farsoudeh as the Chairman of MSL.  Farsoodeh and Partnership Co., a company based in Kish Island, Iran, has also been associated with the individuals working for the Iranian government.  As noted by U.S. government filings in the Zong Forfeiture Action, Farsoodeh and Partnership Co. bears a strikingly similar name to the Iranian co-conspirator, Houshang Farsoudeh.

60.     Zong also set up shell companies to facilitate the scheme, including a company he registered in 2009 in Seoul, South Korea, originally named KSI Ejder Korea Inc. and later changed to Anchore ("KSI/Anchore").  Zong created and operated other shell companies, including Dynamic First, AutoPex Corporation, Topex Corporation, and Gem Art Corporation.

61.     KSI/Anchore was used as a conduit to convert funds from the Government of Iran into USD and distribute those funds throughout the world by fictitiously "selling" marble tiles and other construction supplies to the Iranian shell company Farsoodeh and Partnership Co., and receiving "payments" for those fictitious supplies from the Central Bank of Iran's account at IBK.

62.     The way that the scheme worked is that KSI Ejder/Anchore would fictitiously "purchase" Italian marble tiles and other construction supplies from MSL, the shell company in Dubai owned by Nayebi, which were then fictitiously "shipped" to Farsoodeh and Partnership Co. in Iran.

63.     False and fictitious contracts, bills of lading, and invoices were created to support the farce that Farsoodeh and Partnership Co. owed KSI Ejder/Anchore money for the fake marble purchases.  Farsoodeh and Partnership then paid KSI/Anchore via the CBI Won Account at IBK,

using the false documents to support the requested transfers from the restricted CBI Won Account. Once KSI/Anchore received those payments, the funds were converted to USD and transferred to individuals and entities around the world, including back to the Iranians and into accounts in the U.S.

64. At least 88 transactions via IBK accounts, which were processed by IBKNY, in its capacity as correspondent bank for IBK, took place during the six-month period from February 2011 to July 2011.

65. The general operation of the sham transactions is exemplified by the following January 2011 series of transactions and events:

- In January 2011, an individual who worked for the Iranian co-conspirators, Muneer AlShaikh, emailed Zong a document dated January 15, 2011 in which KSI/Anchore purported to enter into a written agreement to sell marble tiles to Farsoodeh and Partnership Co. for delivery to Iran.

- Two days later, KSI/Anchore contracted with MSL purportedly arranged for the purchase of approximately $2,277,102 USD worth of marble.

- On a commercial invoice dated January 21, 2011, for marble tiles worth ₩2,000,000,000 KRW (approximately $1,840,000 USD), KSI/Anchore was designated as the shipper and "Farsoodeh Kish & Partnership Co." as the consignee.

- In a document dated January 22, 2011, with the subject line "Export construction material to Iran," Zong, signing for KSE/Anchore, Nayebi, signing for MSL, entered into an agreement that "MSL Gulf Trading" would receive payment for fees and costs associated with KSI/Anchore's transactions between "Farsoodeh & partnership Co in Iran" and "MSL Investment in Dubai."

20

- A commercial invoice dated January 24, 2011, was generated for fictitious marble
  tiles in the amount of ₩650,000,000 KRW (approximately $598,000 USD).
  KSI/Anchore was designated as the shipper and "Farsoodeh Kish & Partnership Co."
  as the consignee.

- On January 25, 2011 Zong opened an account at IBK in the name of KSI Ejder.  Two
  days later, a commercial bank in Iran, Bank Maskan, issued a payment order to the
  Central Bank of Iran's account at IBK (*i.e.*, the CBI Won Account) to transfer
  $2,000,000,000 KRW (approximately $1,840,000 USD) into KSI Ejder's IBK
  account.  One day later, Bank Maskan issued another payment order to IBK to
  transfer $650,000,000 KRW (approximately $598,000 USD) from the CBI Won
  Account into KSI Ejder's account.

66.     Once the Iranian funds were transferred into the KSI/Anchore account as fake
"payment" for the marble tiles and other materials, starting on February 10, 2011 and continuing
through July 20, 2011, those funds were converted to USD and systematically funneled into the
U.S. through correspondent accounts belonging to IBKNY and either remained in the U.S. or were
transferred on to Canada, the U.A.E., or Bahrain.

67.     As set forth in the criminal indictment filed by U.S. federal prosecutors against
Zong in 2016, on February 10, 2011, alone, Zong and Iran initiated 21 transactions causing
$643,857 USD worth of Iranian owned funds to be transferred from accounts at IBK to IBKNY or
other correspondent accounts in the U.S.  Zong and Iran then transferred an additional $4,730,040
USD worth of Iranian funds out of South Korea and through U.S. accounts before the month was
over.  The size of the transfers escalated as the months wore on, so that on a single day in May
2011, Zong transferred $88,438,934 of Iranian funds by way of three sanctions-violating

transactions that went through NY correspondent accounts and eventually made their way to the U.A.E.  The last two transfers of Iranian funds that made it out of Zong's accounts at IBK on July 15, 2011 and July 20, 2011 topped $100 million USD.

68.    On August 28, 2013, a U.S. Magistrate Judge authorized a search and seizure warrant for the email account *orchideagulf@yahoo.com* used by Orchidea.  Those emails established that Orchidea was an Iranian front company used to conduct transactions throughout the world in order to distribute funds belonging to the Government of Iran.

69.    In early 2011 emails, produced pursuant to the warrant, Zong explained how to make KSI/Anchore appear as though it was showing a profit so as to legitimize the fraudulent business transactions.  Pursuant to his explanation MSL would issue an offer sheet, and then KSI/Anchore would issue a commercial invoice.  The offer sheet had to be "back dated," be lower in amount than the invoice, and contain commodities as "different kinds of Italian Marbel [sic] Tile."  This would show that "KSI Ejder makes a little profit, [and] [a]gain this is just paper works for to get approval from Korea Central bank."  Emails also indicated that associates for Orchidea reached out directly to Zong to ensure the paperwork for the business matched Zong's paperwork.

70.    Another email from that time period disclosed that the "Iranians" knew that due to international regulations and sanctions against transactions with Iranian companies, the consequences of getting caught for their scheme could include being "jailed, [or] huge fine[s] based on money laundering, illegal money exchange, [and] br[eaking] the law."  Understanding the importance of avoiding detection by U.S. authorities, Iran established a commission and fee structure that compensated Zong financially and provided specific instructions for him to wire Iranian government funds through IBK bank and onward throughout the world.

71.    In order to ensure the success of this scheme, the participants needed to transfer

funds to IBK, which had agreed to ensure that the falsified documents would clear the review process set up to restrict transfers to and from the CBI Won Accounts to those authorized by law. Zong admitted in an email to the Orchidea email account that the "***Industrial Bank of Korea . . . know well our transactions are based on fabricated & fake documents***," and that the "authorities [were] cooperating to do transaction according to my requesting without proper investigation."

72.     IBK's cooperation was easily secured through bribes from the participants in the Zong-Iranian Scheme to top bank officials, including a Senior Manager and Executive Vice President.  As Zong disclosed on or about March 7, 2011, there were at least four bank officers who part of the scheme.  In exchange for their cooperation, "[Zong] agreed to give an allowance to [the] bankers . . . under the table KRW 3.- to 7.- per dollar depending on volume of transaction."

73.     At the end of 2011 and beginning of 2012, Zong once again revealed the nature of the conspirators' relationship with IBK, when he wrote to Hosseinpour:

- "As I told you before we have done for executives of IBK more than enough.  [T]hey want to help us but IBK told me at this moment need to be quite for a while."

- "Dear Houshang, [s]orry I was completely drunk with IBK people last night.  [S]ame place we were there (Korean style Geisha house) arranged everything for them.  With me Mr. Seong-Ha Yoo, Senior Executive Vice president ( head of Global market) and Kwang- Wook Jeon, General manager of International Trade."

- "We are waiting for instruction of IBK main office to nominating one of branch and manager who will listen well, a good soldier of V. president Mr. Seog-Ha, yoo. There are almost 100 branch but to open account with a branch to be cooperated us."

74.     As set forth in filings relating to the Zong Forfeiture Action, the Federal Bureau of Investigation ("FBI") did not find any logical business reason for transfers nor any connection

between the Zongs and/or their companies to the beneficiaries throughout the world.  Rather, U.S. government agents concluded that the transfers of Iranian government funds, at the direction of an Iranian front company appeared to be designed to move Iran's money through IBK and on to those companies and thus provide financial services and other financial opportunities to Iran.

> ###     2.     IBK's Willful Failure To Detect And Notify OFAC Of Illegal Transactions At Its New York Branch

75.     During the period of time that the U.S. government was strengthening sanctions against Iran, IBK was aware of and willfully failed to implement procedures in its New York branch that would allow its compliance officer to detect transactions in violation of U.S. sanctions.

76.     From approximately 2006 through 2013, IBKNY's process for reviewing transactions processed by the branch for any illegality, was conducted manually by a single full-time compliance officer (the "Compliance Officer").  The Compliance Officer was hired by, and reported to, IBKNY's branch manager, who in turn reported to IBK's main office in South Korea.

77.     By early 2010, both the Compliance Officer and outside regulators came to understand that IBKNY's manual review system was insufficient and repeatedly flagged the need to enhance the branch's transaction monitoring system with additional resources.  For example, in its 2010 examination of IBKNY, the New York State Banking Department ("NYSBD") (predecessor to the NYDFS) cited deficiencies in IBKNY's manual transaction monitoring system, identifying them collectively as a "Matter Requiring Immediate Attention," and directed IBKNY to commit resources to ensure timely detection and reporting of suspicious activities.

78.     Notwithstanding the recommendation to increase compliance resources, no action was taken by IBKNY's branch manager (the "Branch Manager") or anyone at IBK.  Accordingly, throughout 2010 and early 2011, the Compliance Officer continually urged the Branch Manager to seek approval from IBK's head office for additional resources.  Specifically, in January 2011,

the Compliance Officer wrote a memo to IBK's Compliance Committee, including senior leadership in Seoul summarizing the results of the NYSBD examination, and reiterating his own view that IBKNY's manual review process was "exposing IBKNY to significant Bank Regulatory Sanctions."

79. In addition, in the first quarter of 2011, IBKNY's internal auditor prepared a report that reiterated the NYSBD's finding that IBKNY's "Suspicious Activity Monitoring System [Was] Not Effective," and added the auditor's recommendation that "[m]anagement should commit resources to remedy the deficiencies noted to ensure timely detection and reporting of suspicious activity."

80. Despite these frequent and repetitive warnings, IBK deliberately elected not to adopt the compliance procedures necessary to timely detect illegal transactions at the New York branch.

81. As subsequent investigations by the SDNY U.S. Attorney's Office, NYAG, and NYDFS found, IBKNY also failed to take any corrective measures in the immediate years to follow. IBK was subject to $86 million in penalties for its failure.[32]

## III. Zong And His Family Members Have Faced Civil Forfeiture And Criminal Indictment In The United States And South Korea Related to Zong's Involvement In the Zong-Iranian Scheme

82. In January 2013, the Seoul Central District Prosecutor's Office in South Korea

---

[32] *See* N.Y. Attorney General, *Attorney General James Announces Agreement with Industrial Bank of Korea Related to Illegal Transfer of Over $1 Billion to Iran* (Apr. 20, 2020), https://ag.ny.gov/press-release/2020/attorney-general-james-announces-agreement-industrial-bank-korea-related-illegal; U.S. Department of Justice, Industrial Bank of Korea – Deferred Prosecution Agreement (Apr. 20, 2020), *available at* https://www.justice.gov/usao-sdny/press-release/file/1270016/download; N.Y. Dep't of Financial Services, Consent Order Under New York Banking Law §§ 39 and 44 (Apr. 20, 2020), *available at* https://www.dfs.ny.gov/system/files/documents/2020/04/ea20200419_co_ibk_ibk_ny.pdf.

publicly announced the indictment of Zong in connection with the Zong-Iranian Scheme.  Zong was sentenced to, and has been serving, a term of imprisonment in South Korea that is set to end this year.

83.     The U.S. Attorney's Office in Anchorage, Alaska also filed a criminal indictment against Zong on December 14, 2016, bringing 47 counts against him for (1) conspiracy to violate the IEEPA and evade the prohibitions of the ITR in violation of Title 18, United States Code Section 371; (2) the unlawful provision of services to Iran, in violation of Title 50, United States Code, Section 1705, Title 31, Code of Federal Regulations, Sections 560.203 and 560.204, and Title 18, United States Code, Section 2; (3) engaging in a conspiracy to launder money in violation of Title 18, United States Code, Section 1957, including by knowingly engaging in monetary transactions with property derived from unlawful activity, to wit, a violation of the IEEPA and ITR; and (4) engaging in dozens of illegal money laundering transactions in violation of Title 18, United States Code Section 1957, involving wire transfers of funds, check processing and bank deposits of U.S. currency, with such property having been derived from specified unlawful activity, that is, violations of the IEEPA and ITR.[33]

84.     The Zong Indictment makes clear that the purpose of the alleged conspiracy was to "evade the prohibitions of IEEPA and [ITR] by engaging in false, fictitious and fraudulent transactions which were designed to unlawfully convert and did convert Iranian owned funds

---

[33] *See U.S. v. Zong*, No. 3:16-cr-142 (D. Alaska Dec. 14, 2016), Dkt. 2 (hereinafter, the "Zong Indictment").  Because Zong was incarcerated in South Korea when the criminal indictment was filed against him in 2016, U.S. prosecutors sought Zong's extradition to the United States  The most recent status report filed by the U.S. prosecutors in that action indicates that, as of June 2019, Zong was still incarcerated in Anyang Prison in South Korea, and diplomatic efforts seeking his extradition to the U.S. have been unsuccessful.  Because Zong also owes the South Korean government a penalty fine in the range of several million dollars, which must be paid before he can depart the country, it may be longer until the U.S. case against him is fully prosecuted.  *See id.*, Dkt. 9.

equivalent to approximately $1 billion United States dollars, held in Korean banks, out of the restricted accounts and into more easily tradeable currencies, such as dollars and/or euros, with [Zong] transferring those currencies worldwide, and receiving payment for these acts from individuals subject to the jurisdiction of the Government of Iran."

85.    As set forth in the U.S. criminal indictment against Zong, he received approximately $10 million USD as compensation for his work, which was distributed to and laundered by his family members in the United States.

86.    Those funds were the subject of the Zong Forfeiture Action, filed by the U.S. Attorney's Office in Anchorage, Alaska in 2014, which sought the forfeiture of real estate, vehicles, a yacht, and money from bank accounts owned by Zong, his family members, and accounts in the name of "MSL Gulf Trading One, LLC."

87.    On March 12, 2018, Zong's son, Mitchell Zong, was also indicted on by the U.S. Attorney's Office in Anchorage, Alaska for his role in helping Zong launder money transferred from South Korea to the U.S. in connection with Zong's business activity in violation of the IEEPA.[34]   Several weeks later, Mitchell Zong pleaded guilty to money laundering conspiracy in violation of Title 18, United States Code, Section 1956(h) and received a sentence of 30 months imprisonment and a fine.[35]

## IV.    Iran's Accounts at IBK Were Held In the Names Of The Iranian Government's Agency, Instrumentality, or Alter Ego

88.    Iran's CBI Won Account at IBK was in the name of the Central Bank of Iran. Because, as a matter of fact and law, the Central Bank of Iran is an arm of the Iranian government,

---

[34]   *See U.S. v. Zong*, 3:18-cr-00031 (D. Alaska).

[35]   *Id.*, Dkt. 9.

any assets held by or traced to these entities are also subject to execution in the United States to satisfy Plaintiffs' judgments.

89.     The Central Bank of Iran is wholly owned by the government of Iran.  It describes itself as "banker to the government."[36]  Moreover, the Central Bank of Iran is "mandated to keep government accounts, grant loans and credits to state enterprises and agencies."[37]

90.     The U.S. government has also identified the Central Bank of Iran as part of the government of Iran.  On February 5, 2012, President Obama signed Executive Order 13,599 to implement the 2012 NDAA to "block[]" "all property and interests in property of the Government of Iran, *including the Central Bank of Iran*."  Exec. Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 8, 2012) (emphasis added).  Thus, unlike most central banks around the world, the Central Bank of Iran is deemed to be part and parcel with the Iranian government under U.S. law.

91.     The Central Bank is thus an arm of the government of Iran and should be considered the state itself.  At a minimum, the Central Bank of Iran is an agency or instrumentality of Iran.  The Central Bank of Iran is not a citizen of a state of the United States, and it was created under the laws of Iran.  Indeed, the U.S. government has identified the Central Bank of Iran as "an agency, instrumentality and controlled entity of the government of Iran for all purposes."  31 C.F.R. § 535.433.

92.     Alternatively, the Central Bank of Iran is an alter ego of the government of Iran.  It is a corporate entity that is wholly owned by Iran.  The government of Iran established the Central Bank of Iran in 1960 with Iran's first Monetary and Banking Act "to issue currency and serve as

---

[36] *General   Information*,   Central   Bank   of   the   Islamic   Republic   of   Iran, https://www.cbi.ir/page/GeneralInformation.aspx (last visited Jan. 13, 2021).

[37] *Id.*

the government's banker."[38]   Indeed, the government of Iran exercises day-to-day control over the Central Bank.  The General Assembly of the Central Bank, which oversees the bank's operations, is composed of the President of Iran, the Minister of Economic Affairs, Head of the State Management and Planning Organization, Minister of Industry, Mine and Trade, and one more minister to be selected by the Council of Ministers.[39]   The Governor and Deputy Governor of the Central Bank of Iran are nominated by the President, confirmed by the General Assembly, and appointed by the President.[40]   In short, "the appointment and removal of [the Central Bank of Iran's] governors have been based solely on the discretion of the government."[41]

93.   Iran uses the Central Bank of Iran to achieve Iran's own economic and political goals.  Unlike a typical central bank, the Central Bank of Iran "can neither independently set monetary policy goals nor conduct monetary policy."[42]   Instead, the Central Bank of Iran "chronically serve[s] as a quasi-fiscal arm to finance the unsustainable policies of different [Iranian] governments while simply overlooking its primary task of ensuring price stability."[43]

94.   Further, the General Assembly considers and approves the balance sheet of the Central Bank of Iran and the recommended appropriation of the net profit.[44]

---

[38]   R. Zahedi and P. Azadi, *Central Banking in Iran*, Stanford Iran 2040 Project, at 6 (June 2018), https://iranian-studies.stanford.edu/sites/g/files/sbiybj6191/f/publications/central_banking_in_iran.pdf.

[39]   *Organization*, Central Bank of the Islamic Republic of Iran, https://www.cbi.ir/organization/16147.aspx (last visited Mar. 12, 2020).

[40]   *Id.*

[41]   R. Zahedi and P. Azadi, *Central Banking in Iran*, at 14.

[42]   *Id.*

[43]   *Id.*

[44]   *Organization*, Central Bank of the Islamic Republic of Iran.

95.     The government of Iran has used the Central Bank of Iran to further its military, rather than just Iran's economy, by moving "millions of dollars through banks to support the Quds Force and Hizballah."[45]  The Quds Force, "IRGC's extra-territorial branch responsible for supporting proxies in the region," "engage[s] in large-scale illicit financing schemes to fund its malign activities."[46]  These schemes are "facilitated at the highest levels of Iran's government, including through the Central Bank of Iran."[47]  For example, in May 2018, the U.S. Department of Treasury revealed that the Central Bank of Iran's Governor and the Assistant Director of the Central Bank's international department conspired with the Quds Force "to conceal the movement of illicit funds to its terrorist proxy, Hizballah."[48]

## V.    IBK Exercised Control And Dominion Over The Accounts Necessary To Execute Iran's Fraudulent Conveyances

### A.      IBK's Senior Management And Agents Worked Closely Together To Execute And Conceal The Fraudulent Conveyance Schemes

96.     Senior management and officials at IBK were aware of the fraudulent transfers made to IBK by Iran.  IBK management was fully aware of the scheme to transfer funds owned by Iran to IBK and further transfer those U.S. dollars by transferring those funds out of the restricted CBI Won Account in South Korea and into IBK correspondent accounts in New York and on to other countries, including the United States.  IBK management approved transfers into and out of IBK based on known fraudulent documentation of falsified business relationships and transactions.  The IBK and its officials meaningfully benefitted from the Zong-Iranian Scheme

---

[45]  Iran Action Group, U.S. Department of State, *Outlaw Regime: A Chronicle of Iran's Destructive Activities*, at 5 (2018), https://www.state.gov/wp-content/uploads/2018/12/Iran-Report.pdf.

[46]  *Id.* at 23.

[47]  *Id.*

[48]  *Id.*

that allowed Iran to disguise and funnel at least $1 billion worth of funds to its agents for the express purpose of violating U.S. sanctions.

### B.   IBK Benefitted From Its Participation In The Zong-Iranian Scheme

97.   IBK was a full and willing participant in the fraudulent scheme set up to flout U.S. sanctions against Iran, which were harming IBK's interests.

98.   In 2011, IBK publicly criticized the U.S. government for sanctions against Iranian oil imports.  It is far from a coincidence that one of the public criticisms came from IBK's Senior Manager, Jeon Kwang-wook, who is one of the individuals identified by Zong as a participant in the fraudulent conveyance scheme.  Kwang-wook stated that "[m]any SMEs [small- and medium-sized enterprises] in the information technology sector, automobile and household product industries, which export goods to Iran, are paid through their Korean won accounts at our bank.  If the accounts are shut down, they will definitely be in trouble."[49]  And, according to IBK documents from around the time of the fraudulent transfers, "[s]ince its foundation . . . IBK has contributed to facilitating the economic activities of SMEs and enhancing their economic status," and "proven its unwavering commitment as a partner to SMEs amid . . . challenging times."[50]

99.   IBK officers received kick-backs for their participation in the scheme.  IBK received fees and additional business by cooperating with Iran and permitting Iran's funds to unlawfully flow from Iran to IBK and from the restricted CBI Won Account at IBK to IBK accounts in New York—in violation of U.S. law.

---

[49]  Kim Jae-won, *IBK says Iran sanctions will hurt SMEs*, The Korea Times (Dec. 12, 2011), https://www.koreatimes.co.kr/www/tech/2019/11/129_100650.html.

[50]  *See* Industrial Bank of Korea, 2012 Annual Report, *available at* https://www.lacp.com/2012vision/pdf/10649c.pdf.

100.     According to media reports, during the years when U.S. sanctions against Iran were at their harshest, IBK made "huge" profits due to their special arrangement with Iran.  In 2012, for example, they added the equivalent of $4.4 billion in deposits.[51]

101.     Thus, as U.S. sanctions became more expansive in limiting how IBK could treat the Iranian funds held in the CBI Won Account, the fraudulent scheme freed up hundreds of millions of dollars' worth of assets to be transferred through IBK accounts.  But for these schemes, those funds would not have been available.

### C.     IBK Faces Criminal Liability For Its Execution Of Iran's Fraudulent Conveyances

102.     IBKNY's involvement in the fraudulent transactions prompted a six-year investigation by federal and state prosecutors and financial services regulators in New York.

103.     The federal investigation carried out by the SDNY U.S. Attorney's Office culminated in the deferred filing of a Criminal Information charging IBK with willfully violating Title 31, United States Code, Sections 5318(h), and an agreement by IBK to pay a $51 million penalty to the United States.

104.     In exchange for the deal, IBK agreed to cooperate fully with the SDNY U.S. Attorney's Office, the FBI, the NYAG, NYDFS, and the Federal Reserve Bank of New York related to any matter described in the Criminal Information and Statement of Facts attached to the deferred prosecution agreement and "the fraudulent scheme perpetrated by Zong and the companies he owned and/or controlled," pay the penalty, and commit no future crimes under the federal laws of the United States.  Further, in the event that IBK violates the agreement it may be subjected to criminal liability.

---

[51]  *See* Kim Jae-won, Woori, IBK score with sanctions on Iran, The Korea Times (June 3, 2012), http://koreatimes.co.kr/www/news/tech/2012/06/129_112258.html.

105.    The investigation by the NYAG's Crime Proceeds Strike Force culminated in a similar deal commemorated in a non-prosecution agreement.

106.    The NYDFS's investigation culminated in a consent order resulting in an additional $35 million monetary penalty against IBK and instituted various oversight and reporting requirements on the bank.

## VI.    IBK's Willful Participation In The Zong-Iranian Scheme Enabled The Execution Of International Payments Using The Funds Otherwise Due To Plaintiffs

107.    IBK's receipt and re-transfer of the Iranian funds knowingly and intentionally caused at least $1 billion of Iranian funds to pass through IBK's U.S. correspondent accounts located in New York in violation of U.S. sanctions.  Iran's transfers of approximately $1 billion using fake transactions and shell companies to evade U.S. law were made in bad faith while Iran was a defendant in Plaintiffs' lawsuits.

## VII.    IBK Destroyed Evidence That Would Support Plaintiffs' Claims for Relief

108.    IBK had a duty under New York and federal substantive law and the Federal Rules of Civil Procedure Rule 37(e) to maintain and preserve documents and materials related to its unlawful transactions with, and on behalf of, Iran.

109.    For example, under federal law as set forth in the regulations of the U.S. Department of Treasury, IBK was obligated to maintain full and accurate records of transactions conducted through the United States on behalf of Iran.  IBK was also obligated to provide full and accurate information to U.S. financial institutions through which IBK conducted transactions for or on behalf of Iran.  IBK was subject to civil and criminal penalties in the United States for its failure to maintain and keep such records and for causing U.S. financial institutions to conduct transactions for the benefit of Iran without a license or other authorization issued by the U.S. Treasury Department.

110.    IBK also was required to maintain and preserve documents and materials concerning Iranian-related transactions through the United States as soon as there was a reasonable foreseeability of future litigation.  Undoubtedly, the instant that IBK decided to engage in illegal conduct through or in the United States, future litigation arising from that illegal conduct became reasonably foreseeable.  Therefore, IBK should have preserved and kept all documents and materials -- including emails, messages, memoranda, and other recorded communications -- related to its unlawful transactions with, or on behalf of, Iran through or in the United States since at least January 2011.

111.    By July 2011, future litigation shifted from foreseeable to certain when  IBKNY's Compliance Officer informed the IBK "Head Office" in Korea that he had identified unlawful transactions with Iran and that there was "**no doubt** IBKNY will be hit by OFAC with a violation" of U.S. sanctions against Iran.  The Compliance Officer also informed the Head Office of IBK that the source of the unlawful transactions originated in the CBI Won Account in Korea and had to be addressed at the "Head Office."   IBK was compelled to report the small subset of unlawful transactions for or on behalf of Iran identified by the IBKNY Compliance Officer as well the many more unlawful transactions for or on behalf of Iran through other financial institutions in New York.

112.    Yet, as set forth in the Statement of Facts in support of IBK's April 13, 2020 Deferred Prosecution Agreement, "IBKNY disclosed *only* the roughly $10 million in prohibited transactions that had been routed through IBKNY" and "*IBK never* self-reported to OFAC its involvement in the remaining $990 million worth of prohibited transactions."[52]  IBK officials

---

[52] Exhibit C to April 13, 2020 Deferred Prosecution Agreement, Statement of Facts at ¶ 31 (emphasis added).

continued to conceal 99% of the unlawful Iranian transactions, that is, the additional $990 million in unlawful transactions which IBK routed "through other U.S. correspondent accounts."[53]  As outlined in its admissions as part of the Deferred Prosecution Agreement, IBK ultimately reported portions of the additional unlawful transactions to OFAC only "after the Seoul Central District Prosecutor's Office publicly announced the indictment of Zong in connection with the Zong scheme."[54]

113.    In August 2011, however, IBK issued a litigation hold notice only to IBKNY employees directing them not to delete emails.  This notice was <u>not issued</u> to Head Office employees despite IBK being aware that it was the Head Office employees who had direct knowledge of and participated in the Zong-Iranian Scheme and despite being told by the IBKNY Compliance Officer that the Head Office was the source of the unlawful transactions.  IBK further rendered the August 2011 litigation hold meaningless by not alerting the IT department of the hold until April 2013.  As admitted to by IBK in the Criminal Information and Statement of Facts attached to the Deferred Prosecution Agreement, IBK and its IT department continued deleting these emails which should have been subject to the August 2011 litigation hold notice.

114.    It was not until April 2013, after Zong's indictment, that IBK formally issued a litigation hold to its Head Office employees in Korea and the Head Office's IT department.  Even then, this April 2013 formal litigation hold was not put into effect.  As admitted to by IBK in the Criminal Information and Statement of Facts attached to the Deferred Prosecution Agreement, even after the formal litigation hold was issued by IBK to its IT department, the Head Office IT

---

[53] *Id.* at ¶ 30.

[54] *Id.* at ¶ 31.  As a condition of the April 13, 2020 Deferred Prosecution Agreement, IBK stipulated "that the facts set forth in the Statement of Facts, attached hereto as Exhibit C and incorporated herein, are true and accurate, and admits, accepts and acknowledges that it is responsible under United States law for the acts of its current and former officers and employees as set forth in the Statement of Facts."  https://www.justice.gov/usao-sdny/press-release/file/1270016/download.

department maintained the "automatic" deletion of emails subject to the April 2013 litigation hold. The IT department did not act to stop the "automatic" deletion of emails and related documents until August 2014.

115.   IBK's destruction of documents materially affected the federal government's investigation into the unlawful Iranian transactions.   As admitted to by IBK in the Criminal Information and Statement of Facts attached to its Deferred Prosecution Agreement, IBK's production of documents to government investigators "were of limited assistance, because IBK failed to take steps to properly preserve relevant emails and documents at both IBKNY and the Head Office."

116.   The true extent of IBK's unlawful and fraudulent conduct may never be known due to its spoliation of evidence.   Under Federal Rules of Civil Procedure, Rule 37(e):

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.

117.   Should IBK claim as a defense or otherwise that Plaintiffs have failed to plead or to discover facts or evidence sufficient to support their claims, then the Plaintiffs will ask the Court to make a determination that such destruction and failure to preserve were intentional, to presume that the destroyed and lost evidence would have supported Plaintiffs' claims, and to enter a default

judgment against IBK.  (See also New York Pattern Jury Instruction 1:77 ("If you find that [defendant] destroyed a [document] that relates in an important way to the question of [plaintiffs' claims], and that no reasonable explanation for such destruction has been offered, you may, although you are not required to, infer that the destruction of the [document] had a fraudulent purpose and that if produced the [identify item destroyed] would have been against [defendant's] interest. Moreover...you may consider it decisive with respect to [plaintiffs' claims.])

## CLAIMS FOR RELIEF

### FIRST COUNT

**(Against IBK for Rescission and Turnover of Fraudulent
Conveyances in Violation of New York Debtor and Creditor Law § 273-a)**

118.    Plaintiffs incorporate herein by reference paragraphs 1 through 117, *supra*, as if fully set forth herein.

119.    Iran fraudulently conveyed approximately $1 billion dollars' to IBK in bad faith with the express intention of laundering these funds in order to convert KRW-denominated funds to USD and transfer those funds into the world's financial markets in violation of U.S. sanctions. Transfers were made using fraudulent documents, fake transactions, and shell companies for no legitimate purpose.  IBK willingly and knowingly received fraudulent transfers from Iran and participated in and benefited from the fraudulent schemes to fraudulently divert Iranian assets owed to Plaintiffs to accounts under other individuals' and entities' control that enabled the government of Iran and its agency, instrumentality, and alter ego to engage in illicit financial transactions that violated U.S. sanctions and exploited the U.S. financial system.

120.    IBK knowingly accepted the fraudulent transfers and benefitted by receiving substantial commissions for its role in the schemes, earning fees and revenues that would have been unavailable to it absent the transfers at issue, as well as the use of the money while Iran's

37

funds were in IBK's possession.  IBK also benefitted from its participation in and execution of the Zong-Iranian Scheme by knowingly and deliberately concealing the scheme from U.S. regulators so that it could maintain its access to the U.S. financial system and its U.S. correspondent banking accounts while profiting from its relationship with Iran.

121.    The conveyances of Iranian funds from the CBI Won Account at IBK to other accounts at IBK were made without fair consideration because they were designed to be fraudulent and not conducted in good faith.  In addition, fraudulent conveyances of Iranian funds that were directed from IBK to third-party beneficiaries through IBK's U.S. correspondent accounts were also made without fair consideration because they were designed to be fraudulent and not conducted in good faith.

122.    Iran directed numerous fraudulent transfers of the funds to and out of its CBI Won Account at IBK to other accounts held by sham Korean entities at IBK in bad faith through the use of shell corporations, fake documentation, and phony transactions with the express intent that the true nature and purpose of those funds be concealed before they were transferred on by Zong. Once IBK had transferred the funds to accounts in the name of Zong and/or the front companies for no legitimate business purpose, the funds were converted to USD and used to execute international financial transactions, including at least $1 billion in transfers that were deliberately routed through IBK's correspondent accounts in New York.

123.    Iran failed to deal honestly, fairly and openly when it directed its funds to a restricted account meant to enable transactions in conformance with U.S. sanctions for the exact opposite purpose—to evade U.S. sanctions and engage in money laundering, falsified documents, front companies, and payment intermediaries.  In efforts to evade detection by Plaintiffs and others, IBK worked with Iran's agents to nullify the review process for transactions related to the CBI

Won Account and instead make transfers in violation of the restrictions on that account.  By falsifying the nature of the transactions, the Iranian funds could be transferred out of the CBI Won Account to be laundered and converted to USD and travel through IBK's New York correspondent accounts and into the U.S. financial system.  Together, the Zong-Iranian Scheme succeeded in defrauding U.S. financial institutions by inducing them to provide financial services for the government of Iran and Central Bank of Iran in violation of sanctions laws.  By evading detection, Iran intentionally evaded Plaintiffs' legitimate claims to the transferred funds.

124.   To execute these schemes while evading sanctions and maintaining its U.S. correspondent accounts, IBK deliberately failed to implement compliance systems that would identify suspicious or unlawful transactions.  This allowed the fraudulent conveyances to occur without raising any red flags that would subject the transfers to more careful review.  Even when, despite IBK's efforts, a small handful of the sanctions-violating transactions were identified by a single individual at IBKNY, IBK still waited over a month to report them to OFAC.  It would be two more years before IBK reported the remaining 99% of unlawful transactions to OFAC and only after it was effectively compelled to do so by the indictment of Zong.

125.   IBK's deception and deliberate failure to abide by U.S. banking regulations hindered and delayed the U.S. Treasury Department's ability to discover that Iran was, in fact, laundering nearly $1 billion through IBK and into the U.S. financial system at institutions in New York.  IBK's receipt of the Iranian money and its decision to launder those funds using fake documents and phony transactions shielded a billion dollars of Iranian assets from potential execution by Plaintiffs in the United States.

126.   At the time Iran made the fraudulent transfers from February 2011 until at least July 2011, Iran was a defendant in the actions initiated by the *Amduso* plaintiffs, the *Wamai* plaintiffs,

and the *Onsongo* plaintiffs in the D.C. District Court.  Those actions resulted in final judgments rendered against Iran in the amounts of $1,755,878,431.22 to the *Amduso* plaintiffs, $3,566,104,489.58 to the *Wamai* plaintiffs, and $199,106,578.19 to the *Onsongo* plaintiffs.

127.    Iran has failed to satisfy the judgments.

128.    The transfers of Iran's funds to the CBI Won Account at IBK, to and through additional accounts at IBK and then to IBK's accounts in New York were made with knowledge of Plaintiffs' claims and during the pendency of Plaintiffs' lawsuits.  The transfers, which were made using fake transactions, fraudulent documents, and shell corporations—all to evade US sanctions and without a legitimate business purpose—were not made in good faith.  Because Iran has failed to satisfy Plaintiffs' judgments, Iran's conveyances were fraudulent as to Plaintiffs under New York Debtor and Creditor Law Section 273-a.

129.    As a result of the fraudulent nature of the Zong-Iranian Scheme, Plaintiffs are entitled to an order setting aside the conveyances and causing IBK to turn over the transferred property to Plaintiffs.

130.    Alternatively, to the extent the assets fraudulently transferred no longer exist or are no longer in IBK's possession, Plaintiffs are entitled to an order requiring IBK to pay money damages to Plaintiffs in the amount of the judgments.

131.    Furthermore, as a result of IBK's gross and wanton conduct, namely knowingly permitting sanctions-violating transactions to occur on the basis of falsified documents, failing to implement systems that might detect such unlawful transactions, and once-detected, omitting 99% of the fraudulent transactions from its report to OFAC, Plaintiffs are entitled to an order requiring IBK to pay punitive damages in the amount of the judgments.

## SECOND COUNT

**(Against IBK for Rescission and Turnover of Fraudulent
Conveyances in Violation of New York Debtor and Creditor Law Section 276)**

132.    Plaintiffs incorporate herein by reference paragraphs 1 through 131, *supra*, as if fully set forth herein.

133.    Iran fraudulently conveyed restricted funds to the CBI Won Account at IBK so that it could use the funds to conduct international financial transactions.  IBK worked with Iran and its agents to transfer funds and benefited from the fraudulent scheme to fraudulently divert Iranian assets owed to Plaintiffs into and out of the CBI Won Account at IBK to other accounts at IBK and eventually to third-party beneficiaries through U.S. correspondent accounts in violation of U.S. sanctions and exploitation of the U.S. financial system.  Both separately and collectively, these transactions bear a number of badges of fraud, including, but not limited to, the fact that the transfers took place while Iran was a defendant in Plaintiffs' lawsuits, the transfers took the form of multiple secret transactions not in the ordinary course of business, the transfers lacked adequate consideration, the transfers utilized fraudulent documents, fake transactions and multiple shell companies for no legitimate business purpose, Iran retained the use of the funds after the chain of fraudulent transfers was complete, and Iran's knowledge of Plaintiffs' claims and the judgments at the time the transfers occurred.

134.    To accomplish the Zong-Iranian Scheme, Iranian agents, IBK, and others involved in the scheme worked closely together.  The Iranian agents involved in the scheme coordinated closely with Zong, who consistently met and communicated with senior officials at IBK to ensure that the schemes would be designed and carried out carefully so that Iranian funds could be transferred without detection.  The Iranian co-conspirators, Nayebi, Hosseinpour, and Farsoudeh,

are designated Foreign Sanctions Evaders and were operating in the service of the Government of Iran.

135.    Iran transferred or caused to be transferred funds into the CBI Won Account and then to other accounts at IBK outside the ordinary course of business, because Iran knew that IBK would receive the transfers and then transfer Iran's funds on based upon falsified business relationships and fake supporting documents.  To carry out these schemes for the government of Iran, IBK deliberately accepted falsified documents to substantiate the fake transactions in order to purport to comply with the restrictions on transfers in and out of the CBI Won Account at IBK; and concealed from U.S. regulators and other financial institutions IBK's participation in and execution of these schemes to purposefully evade detection and circumvent U.S. sanctions.

136.    Iran and IBK effectuated the fraudulent schemes with the intention of evading Iran's debt to Plaintiffs, as well as hindering and delaying the U.S. Treasury Department's ability to administer sanctions.  Iran defrauded U.S. regulators through transfers, based on falsified documentations, to and from the CBI Won Account through to other accounts at IBK with the specific intent that the funds would be converted to USD and transferred into the U.S. financial system in fabricated conformance with U.S. sanctions laws, thereby providing Iran access to USD-denominated funds and the U.S. financial system.

137.    At the time of the fraudulent conveyances that occurred from February 2011 until at least July 2011, Iran was a defendant in the actions initiated by the *Amduso* plaintiffs, the *Wamai* plaintiffs, and the *Onsongo* plaintiffs in the D.C. District Court.  Those actions resulted in final judgments rendered against Iran in the amounts of $1,755,878,431.22 to the *Amduso* plaintiffs, $3,566,104,489.58 to the *Wamai* plaintiffs, and $199,106,578.19 to the *Onsongo* plaintiffs.

138.    Iran has failed to satisfy the judgments.

139.    As a result of the fraudulent nature of Iran's transfer of nearly $1 billion to IBK and onward, Plaintiffs are entitled to an order from the Court setting aside the conveyances and causing IBK to turn over the transferred property to Plaintiffs.

140.    Alternatively, to the extent the assets fraudulently transferred no longer exist or are no longer in IBK's possession, Plaintiffs are entitled to an order requiring IBK to pay money damages to Plaintiffs in the amount of the judgments.

141.    Furthermore, as a result of IBK's gross and wanton conduct, namely knowingly permitting sanctions-violating transactions to occur on the basis of falsified documents, failing to implement systems that might detect such unlawful transactions, and once-detected, omitting 99% of the fraudulent transactions from its report to OFAC, Plaintiffs are entitled to an order requiring IBK to pay punitive damages in the amount of the judgments.

### THIRD COUNT

### (Against IBK for Turnover Pursuant to C.P.L.R. § 5225)

142.    Plaintiffs incorporate herein by reference paragraphs 1 through 141, *supra*, as if fully set forth herein.

143.    Section 5225(b) of the C.P.L.R. states, in relevant part, that a court "shall require" a "person in possession or custody of money . . . in which the judgment debtor has an interest or . . . a person who is a transferee of money . . . from the judgment debtor . . . to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor."

144.    Pursuant to Rule 69(a) of the Federal Rules of Civil Procedure and C.P.L.R. § 5225, Plaintiffs respectfully request that the Court enforce Plaintiffs' judgments against Iran by issuing an order conveying, assigning, and directing the payment to Plaintiffs of all rights, title, and interest of Iran in any Iranian assets that remain in the possession of IBK.

## FOURTH COUNT

### (Against IBK for Turnover Pursuant to the Terrorism Risk Insurance Act)

145.    Plaintiffs incorporate herein by reference paragraphs 1 through 144, *supra*, as if fully set forth herein.

146.    TRIA provides that "[n]otwithstanding any other provision of law, . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in the aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable."  TRIA § 201(a).

147.    Iran has been designated a terrorist party pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. App. § 2405(j), beginning January 19, 1984, and therefore is a "terrorist party" as defined by TRIA, § 201(a).

148.    In Executive Order 13,599, the President invoked his IEEPA authority and "blocked" "[a]ll property and interests in property of the Government of Iran, including the Central Bank of Iran, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any foreign branch."  77 Fed. Reg. 6,659.

149.    Plaintiffs hold judgments for compensatory damages against Iran based on an act of terrorism under 28 U.S.C. § 1605A.

150.    The Central Bank of Iran satisfies the definition of Iran because it is owned or controlled by, or acting on behalf of, the government of Iran.

151.    Alternatively, the Central Bank of Iran satisfies the definition of Iran because it is an agency or instrumentality or alter ego of the government of Iran.

44

152.    Plaintiffs are thus entitled to an order directing IBK to turn over any remaining Iranian funds in partial satisfaction of the compensatory damages awarded in the judgments.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.    Enter an order rescinding, or setting aside, the fraudulent conveyances made by Iran to accounts at IBK on behalf of the Central Bank of Iran, and requiring IBK to turn over the fraudulently transferred assets to Plaintiffs up to the amount of Plaintiffs' judgments, including pre- and post-judgment interest;

2.    Enter an order requiring IBK to pay Plaintiffs monetary damages in the amount of Plaintiffs' judgments or the amount of the fraudulently conveyed funds if less, including pre- and post-judgment interest, to the extent that the fraudulently transferred assets no longer exist or are no longer in IBK's possession;

3.    Enter an order directing IBK to turn over any asset of Iran currently within its possession;

4.    Enter an order requiring IBK to pay Plaintiffs punitive damages;

5.    Enter an order enjoining IBK from taking any action to transfer, dispose of, encumber, or otherwise reduce or jeopardize Plaintiffs' interest in Iranian assets;

6.    Order payment of Plaintiffs' attorneys' fees and expenses; and

7.    Award Plaintiffs other and further relief the Court deems just and proper.

Dated:  January 14, 2021                    Respectfully submitted,


**THE MILLER FIRM, LLC**

/s/ Edward Maggio
Michael J. Miller, Esq. (*pro hac vice* to be filed)
Edward Maggio, Esq.

Jeffrey Travers, Esq. (*pro hac vice* to be filed)
The Miller Firm LLC
108 Railroad Avenue
Orange, VA 22960
Telephone: (540) 672-4224
emaggio@millerfirmllc.com
mmiller@millerfirmllc.com

**MM~LAW, LLC**

Gavriel Mairone, Esq.
Adora Sauer, Esq. (*pro hac vice* to be filed)
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611
Telephone: (312) 253-7444
Fax: (888) 966-0262
CTlaw@mm-law.com
Adora@mm-law.com

**HOLLAND & HART, LLP**

Steven W. Pelak, Esq. (*pro hac vice* to be filed)
Gwen S. Green, Esq. (*pro hac vice* to be filed)
Michael O'Leary, Esq.
901 K Street, N.W., 8th Floor
Washington, D.C. 20001
Telephone: (202) 654-6929
SWPelak@hollandhart.com
GSGreen@hollandhart.com
MJOLeary@hollandhart.com

**THE ROTHENBERG LAW FIRM, LLP**

Allen L. Rothenberg, Esq.
Harry Rothenberg, Esq.
1420 Walnut Street
Philadelphia, PA 19102
Telephone: 800-624-8888
allen@injurylawyer.com
harry@injurylawyer.com

*Attorneys for Plaintiffs*