UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
  WINFRED WAIRIMU WAMAI, et al.,        :
                                       :
                          Plaintiffs,  :          21cv325 (DLC)
                                       :
              -v-                       :          OPINION AND ORDER
                                       :
  INDUSTRIAL BANK OF KOREA,             :
                                       :
                          Defendant.    :
                                       :
-------------------------------------- X

APPEARANCES:

For plaintiffs:
Michael J. Miller
Kyung Jae Han
Jeffrey Travers
The Miller Firm, LLC
108 Railroad Avenue
Orange, VA 22960

Gavriel Mairone
Adora Sauer
MM Law, LLC
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611

Steven W. Pelak
Gwen S. Green
Michael O'Leary
Holland & Hart, LLP
901 K Street N.W., 8th Floor
Washington, DC 20001

Allen L. Rothenberg
Harry Rothenberg
The Rothenberg Law Firm, LLP
1420 Walnut Street
Philadelphia, PA 19102

Steven R. Perles
Edward B. MacAllister

Perles Law Firm, PC
816 Connecticut Avenue N.W., 12th Floor
Washington, DC 20006

For defendant Industrial Bank of Korea:
Carl H. Loewenson, Jr.
J. Alexander Lawrence
Morrison & Foerster LLP
250 West 55th Street
New York, NY 10019

DENISE COTE, District Judge:

Three hundred and twenty-three judgment creditors of Iran
have brought this lawsuit against defendant Industrial Bank of
Korea ("IBK"), a bank that is based in the Republic of Korea
("Korea") and operates in the United States.  They contend that
IBK illegally transacted with Iran to circumvent both U.S.
sanctions on Iran and the execution of their judgments on
Iranian assets.  The complaint seeks a turnover of funds related
to those illegal transactions pursuant to the New York
fraudulent conveyance statute and related provisions of New York
and federal law.  IBK has moved to dismiss.  It argues that the
doctrine of forum non conveniens warrants dismissal in favor of
litigation in the courts of Korea.  For the following reasons,
the motion to dismiss is conditionally granted.

**Background**

The following facts are derived from the complaint and other documents properly considered on a motion to dismiss.[1] This Opinion also incorporates by reference this Court's prior Opinion in Owens v. Turkiye Halk Bankasi A.S., No. 20cv2648 (DLC), 2021 WL 638975 (S.D.N.Y. Feb. 16, 2021), which addressed a case that involved similar facts and identical legal theories.

I.   The Plaintiffs' Litigation Against Iran and the Iranian Sanctions Regime

The backdrop to this litigation is a series of lawsuits against the government of Iran and the United States sanctions regime that restricts Iran's access to the American financial system.  This relevant background is described in detail in this Court's Opinion in Owens, and this Opinion discusses it only briefly.

The 323 plaintiffs in this action are victims, or the representatives of the estates of victims, of terrorist attacks committed against United States embassies in Kenya and Tanzania by groups linked to the government of Iran.[2]  An overwhelming

---

[1] Since the sole issue presented by IBK's motion to dismiss is forum non conveniens, a court may consider both the complaint and other documents submitted by the parties in conjunction with the motion to dismiss.  See Martinez v. Bloomberg LP, 740 F.3d 211, 216 (2d Cir. 2014).

[2] All plaintiffs in this case were also plaintiffs in Owens.

majority of the plaintiffs do not live in New York: of the 323 plaintiffs, 269 reside overseas, and of the 54 plaintiffs who reside in the United States, only three live in New York.  As a result of litigation against Iran in United States courts, in which Iran defaulted, the plaintiffs are judgment creditors of Iran and are collectively owed over $5 billion by Iran.  But the plaintiffs have been unable to collect any portion of these judgments.

As described in Owens, the United States has imposed an extensive web of sanctions on Iran, which, among other things, largely prohibits Iran and its instrumentalities from accessing the American financial system.  This sanctions regime is central to this case for two reasons.  First, it has limited the plaintiffs' ability to execute on Iranian assets to satisfy their judgments.  This is because there are few Iranian assets in the United States and Iran has obscured its ownership of assets in the United States in order to circumvent American sanctions and its creditors.  Second, the sanctions regime prohibits banks operating in the United States from, in most circumstances, doing business with Iran and its instrumentalities.

II.  IBK and its Alleged Sanctions Violations

     IBK is a financial institution headquartered in and
organized under the laws of Korea.  The Korean government owns a
majority of IBK's stock, and IBK's management is ultimately
accountable to the President of Korea and Korean regulatory
agencies.  IBK's operations are overwhelmingly focused on Korea,
but it has a small physical presence in New York, which is its
only physical location in the United States.  It maintains a
single branch in New York (as compared to 635 branches in Korea)
and of its 13,930 worldwide employees, only 29 are based in New
York.  IBK's New York operations primarily involve the provision
of financial services to Korean and Korean-American businesses.

     Korean law permits Korean entities to do business with Iran
and Iranian entities in certain circumstances.  To facilitate
transactions between Korea and Iran, the Central Bank of Iran
opened accounts (the "CBI Accounts") at IBK in 2010.  The Korean
government imposed certain restrictions on the use of these
accounts to ensure that the accounts were not used to violate
Korean law or the U.S. sanctions regime.  These restrictions
included a review process for transactions involving the CBI
Accounts, in which the Korean government and IBK were required
to examine certain business documentation associated with
proposed transactions involving the CBI Accounts to ensure that

the transactions reflected authentic trade relationships that comported with Korean law.

The plaintiffs allege that in 2011, the IBK accounts were used to facilitate over a billion dollars in transactions that violated U.S. sanctions.  The ringleader of these illegal transactions was an American businessman named Kenneth Zong, who set up a series of shell companies in Korea, Iran, and elsewhere.  These shell companies undertook what purported to be a series of legal transactions between Korean and Iranian companies via the CBI Accounts.  In fact, these transactions were a sham, and the money flowing through the CBI Accounts was in fact money belonging to the Iranian government.  Zong and his coconspirators presented falsified documents to IBK and the Korean government in order to circumvent regulatory requirements and mask the nature of the transactions.  Through the use of shell companies and the CBI Accounts, Zong and his coconspirators were able to convert Iranian government funds into U.S. dollars for use in transactions involving U.S. institutions that would otherwise violate U.S. law.  As a result of these transactions, over $1 billion in Iranian funds passed through IBK's correspondent bank accounts at New York banks, in violation of U.S. sanctions law.

To circumvent the restrictions imposed on the CBI Accounts by the Korean government, Zong and his coconspirators bribed several senior officials at IBK.  As a result of these bribes, IBK officials failed to properly scrutinize the underlying documents associated with Zong's transactions, in violation of the aforementioned Korean regulations.  Some of the transactions passed through IBK's branch in New York, which failed to identify potential sanctions violations due to substandard compliance protocols.  If IBK had complied with its obligation to review the underlying transaction documents associated with use of the CBI Accounts, it would have identified the transactions as a sham.  IBK profited from the scheme through fees associated with the transactions.

In 2013, Zong was indicted in Korea for his role in the scheme.  He is currently serving a prison sentence in Korea. Both Zong and one of his family members who participated in his scheme are also facing federal criminal charges in the United States.  Federal and state prosecutors and financial regulators in New York also investigated IBK's role in the scheme.  IBK eventually entered into a deferred prosecution agreement in this Court, in which it agreed to pay a penalty of $51 million for its facilitation of Zong's scheme to evade U.S. sanctions on Iran.  IBK also entered into a deferred prosecution agreement

with the New York Attorney General and agreed to a consent decree with the New York Department of Financial Services that involved a penalty of $35 million and the imposition of certain oversight requirements on the bank.

III. Procedural History

The plaintiffs commenced this action on January 14, 2021. Their Complaint alleges four causes of action.  The first cause of action seeks rescission and turnover of fraudulent conveyances under N.Y. Debt. & Cred. Law § 273-a.[3]  Second, they bring a claim for rescission and turnover of fraudulent conveyances made with intent to evade a judgment, pursuant to N.Y. Debt. & Cred. Law § 276.  The third cause of action seeks turnover under N.Y. C.P.L.R. § 5225.  Finally, the complaint seeks turnover pursuant to the Terrorism Risk Insurance Act, § 201(A), 28 U.S.C. § 1610(f)(1)(A).

On February 16, this Court issued its Opinion conditionally dismissing Owens on forum non conveniens grounds.  In the wake of the Owens decision, IBK moved on March 2 to stay this case

---

[3] In 2020, New York revised its fraudulent conveyance statute, and the revisions took effect on April 4, 2020.  Uniform Voidable Transactions Act, 2019 Sess. Law News of N.Y. Ch. 580 (A. 5622)(McKinney's).  The revisions do "not apply to . . . transfer[s] made" before April 4, 2020. Id. at § 7.  Since all of IBK's actionable conduct alleged in the Complaint occurred before April 4, 2020, references to the New York fraudulent conveyance statute in this Opinion are to the version that was in effect prior to April 4, 2020.

pending the resolution of any appeal of Owens.  In the alternative, IBK sought a bifurcated briefing schedule for its intended motion to dismiss, under which it would first move to dismiss on the forum non conveniens issue addressed in Owens and then, if that motion to dismiss were to be denied, it would be given the opportunity to move to dismiss on other grounds.  The Court found that the proposed bifurcation of the motion to dismiss briefing would facilitate "just, speedy, and inexpensive determination of [this] action," Fed. R. Civ. P. 1, and adopted IBK's proposal to limit motion to dismiss briefing to the forum non conveniens issue.  IBK moved to dismiss on the grounds of forum non conveniens on April 13.  The motion to dismiss became fully submitted on June 3.

## Discussion

"The doctrine of forum non conveniens allows a district court to refuse to entertain jurisdiction of a case" in favor of a foreign country's courts "when doing so would best serve the convenience of the parties and the ends of justice." Gross v. Brit. Broad. Corp., 386 F.3d 224, 229 (2d Cir. 2004) (quoting Koster v. (American) Lumbermens Mut. Cas. Co., 330 U.S. 518, 527 (1947)).  A district court maintains "broad discretion" in determining whether to dismiss a case on the basis of forum non conveniens.  Bigio v. Coca-Cola Co., 448 F.3d 176, 180 (2d Cir.

9

2006).  The Second Circuit has, however, set out "a three-step process to guide the exercise of that discretion."  Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005).  "At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum."  Id.  At the second phase of the analysis, the district court "considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute."  Id.  "Finally, at step three, a court balances the private and public interests implicated in the choice of forum."  Id.  Each element is addressed in turn.

I.  Deference to the Plaintiffs' Choice of Forum

"Any review of a forum non conveniens motion starts with a strong presumption in favor of the plaintiff's choice of forum."  Norex, 416 F.3d at 154 (quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981).  But that strong presumption does not amount to absolute deference to the plaintiff's choice.  Instead, "the degree of deference given to a plaintiff's forum choice varies with the circumstances," Iragorri v. United Techs. Corp., 274 F.3d 65, 71 (2d Cir. 2001), and "moves on a sliding scale depending on the degree of convenience reflected by the choice in a given case," Norex, 416 F.3d at 154.

Generally, when "the plaintiff[] or the lawsuit[]" has a substantial "bona fide connection to the United States" and "considerations of convenience favor the conduct of the lawsuit in the United States," it will be "difficult . . . for the defendant to gain dismissal for forum non conveniens." Iragorri, 274 F.3d at 72.  In order to assess whether "considerations of convenience" favor litigating in an American forum, courts are instructed to look to

> the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense.

Id.  By contrast, when "it appears that the plaintiff's choice of a U.S. forum" was motivated by "attempts to win a tactical advantage," it becomes "easier . . . for the defendant to succeed on a forum non conveniens motion."  Id.

Several principles apply specifically to the scenario presented in this case, where a group of foreign plaintiffs and American plaintiffs bring suit together.  Generally, "when a foreign plaintiff chooses a foreign forum, it is much less reasonable to presume that the choice was made for convenience." Iragorri, 274 F.3d at 71 (quoting Reyno, 454 U.S. at 256). There is therefore "little reason to assume" that a U.S. forum "is convenient for a foreign plaintiff."  Id.  A foreign

11

plaintiff's choice of a U.S. forum is nevertheless "entitled to some weight," even if it is entitled to less weight than an American plaintiff's choice of an American forum.  Bigio, 448 F.3d at 179.  Further, as this Court noted in Owens, "the plaintiffs' choice of forum in cases" like this one "where the U.S. resident plaintiffs are significantly outnumbered by foreign plaintiffs" is entitled to less deference than an individual American plaintiff's choice of an American forum. 2021 WL 638975, at *4.

In this case, as in Owens, these considerations indicate that the plaintiffs' choice of forum is entitled to minimal deference.  The vast majority of the plaintiffs here are not resident in the United States, and of the handful of plaintiffs who are U.S. residents, only a small fraction live in New York. The plaintiffs' residence is therefore not convenient to the chosen forum.

Moreover, this case primarily involves allegations that Korea-based employees of a Korean bank conspired to violate U.S. law and fraudulently convey Iranian funds.  Much of the potential proof, then, is in Korea.  The plaintiffs argue that some portion of the relevant evidence may be available in the U.S. because of the state and federal investigations into IBK's conduct, but that evidence would be in the hands of state and

federal prosecutors and not readily available to the parties in this litigation.  Further, while the plaintiffs point to potential witnesses in the United States –– such as former employees of IBK's New York branch and state and federal regulators who investigated issues involving IBK –– that may have some knowledge of issues related to IBK's business practices, the plaintiffs provide no reason to believe that those witnesses have knowledge of "the precise issues that are likely to be actually tried."  Iragorri, 274 F.3d at 74.  If this case proceeds in New York, then, discovery and trial would likely involve an arduous process of securing the appearance of witnesses without the benefit of this Court's subpoena power and transporting witnesses and evidence to the United States.  Iragorri instructs that the unavailability of witnesses and evidence in the plaintiffs' chosen forum weighs against deference.

Additionally, it is unclear whether IBK is amenable to jurisdiction in New York in this case.  In its motion to dismiss based on forum non conveniens, IBK indicated its intent to move to dismiss for lack of personal jurisdiction and lack of subject matter jurisdiction due to its immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605 et seq.  The plaintiffs dispute these potential jurisdictional arguments,

arguing that IBK waived them by agreeing to a deferred prosecution agreement and that this Court would have jurisdiction under New York state law even without the effect of the deferred prosecution agreement.  Given these disputes, this Court would be required to address complex threshold issues of state and federal law before proceeding to the merits of this litigation.[4]  This jurisdictional dispute in and of itself weighs against deferring to the plaintiffs' choice of forum.[5]

---

[4] Given that a denial of sovereign immunity is immediately appealable under the collateral-order doctrine, see Funk v. Belneftekhim, 861 F.3d 354, 363 (2d Cir. 2017), the Second Circuit could also be burdened with addressing threshold jurisdictional issues presented by this litigation.

[5] In arguing for deference to their choice of forum, the plaintiffs note that Congress has abrogated foreign sovereign immunity in certain cases that seek money damages for a foreign sovereign's role in international terrorism.  28 U.S.C. § 1605A; 1610.  It is unlikely that this exception would apply to IBK's immunity because the exception applies to "foreign state[s] . . . designated as a state sponsor of terrorism," 28 U.S.C. § 1605A(a)(2), IBK's sovereign immunity is derivative of Korea's, and Korea is not designated as a state sponsor of terrorism. Vera v. Banco Bilbao Vizcaya Argentaria, S.A., 946 F.3d 120, 135 (2d Cir. 2019) ("The FSIA's terrorism exception does not apply to instrumentalities of a non-designated state.") (citation omitted).

Moreover, this issue is a red herring.  Even if credited, the plaintiffs' argument only allows for subject matter jurisdiction when this Court otherwise would not have it.  See 28 U.S.C. § 1604.  But subject matter jurisdiction is not the issue presented by a forum non conveniens motion; the central premise of the forum non conveniens doctrine is that a "district court [may] refuse to exercise jurisdiction of a case even where jurisdiction is authorized."  Gross, 386 F.3d at 229 (emphasis supplied).

Finally, the plaintiffs note that they have retained qualified U.S. counsel not capable of representing them if this litigation continues in Korea.  While they express concern that they would be unable to retain Korean counsel if this case were to proceed in Korea, they provide no basis for that assertion. In sum, the factors set forth by the Second Circuit in Iragorri suggest that some, albeit minimal, deference should be awarded to the plaintiffs' choice of a New York forum.

II.  Adequacy of Korea as an Alternative Forum

The second step of the forum non conveniens analysis requires consideration of whether the defendant's proposed alternative forum is available and adequate.  "The defendant bears the burden of establishing that a presently available and adequate alternative forum exists."  Abdullahi v. Pfizer, Inc., 562 F.3d 163, 189 (2d Cir. 2009).

IBK proposes Korea as an adequate alternative forum.  "An alternate forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute."  Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru, 665 F.3d 384, 390 (2d Cir. 2011) (citation omitted).  For an alternative forum to be adequate, it need not offer either "the identical cause of action" that the plaintiffs intend to pursue in the U.S. forum,

or "identical remedies." Norex, 416 F.3d at 158 (citation omitted). But where the proposed alternative forum "does not permit the reasonably prompt adjudication of a dispute," the proposed alternative "forum is not presently available," or "provides a remedy so clearly unsatisfactory or inadequate that it is tantamount to no remedy at all," a court may conclude that the proposed alternative forum is inadequate. Abdullahi, 562 F.3d at 189.

Korea is an adequate alternative forum for litigation of this matter. IBK is amenable to service of process there: indeed, IBK's Chief Compliance Officer has averred that it will accept service of process in Korea and will not contest personal jurisdiction in Korea. Further, as will be discussed later in this Opinion, the Court will condition dismissal of this action on a stipulation to accept service in Korea. "An agreement by the defendant to submit to the jurisdiction of the foreign forum can generally satisfy the [amenability to process] requirement." Aguinda v. Texaco, Inc., 303 F.3d 470, 477 (2d Cir. 2002) (citation omitted).

Korea also permits litigation of the subject matter of this dispute. The parties do not dispute that Korean law includes analogues of the fraudulent conveyance and turnover claims alleged in the plaintiffs' complaint. The plaintiffs primarily

16

argue, based on expert declarations submitted with their brief
in opposition to the defendants' motion to dismiss,[6] that they
would be unable to pursue their claims in Korea because, under
Korean law, a precondition to doing so is a Korean court's
recognition of their U.S. default judgments against Iran as
valid.  Their experts contend that a Korean court is unlikely to
do so for various reasons.  IBK's experts dispute this
contention and suggest that a Korean court would be likely to
recognize the plaintiffs' U.S. judgments.

IBK's analysis of whether Korean courts would recognize the
plaintiffs' U.S. judgments is more convincing than that
presented by the plaintiffs and their experts.[7]  For instance,
the plaintiffs argue that Korean courts would be unlikely to
recognize the plaintiffs' judgments because Korean courts must
conclude that a foreign court had "international jurisdiction"

---

[6] These expert declarations, and those submitted by IBK, are
properly considered on a motion to dismiss for <u>forum non
conveniens</u>.  <u>Owens</u>, 2021 WL 638975, at *4 n. 3.

[7] IBK's experts have also pointed out that the conduct alleged by
the plaintiffs can potentially subject IBK to liability under
several different Korean legal frameworks that may not require
recognition of the plaintiffs' judgments in Korea.  These
frameworks include Korean tort law and the Korean law of a
creditor's right of revocation.  In any event, it is unnecessary
to assess whether the availability of a remedy under these
theories is dependent on the recognition of the plaintiffs'
judgments in Korea, because IBK has demonstrated that Korean
courts are likely to recognize the plaintiffs' U.S. judgments as
valid.

to enter a judgment before recognizing that foreign judgment.
But IBK's experts have convincingly demonstrated, through
citations to applicable precedent of the Supreme Court of Korea,
that a Korean court is likely to conclude that the U.S. court
that entered the plaintiffs' default judgments had
"international jurisdiction" under Korean law.  The plaintiffs'
experts have also suggested that a Korean court may decline to
recognize the plaintiffs' U.S. judgments against Iran because,
under Korean law, Iran was entitled to sovereign immunity.  But
IBK's experts have demonstrated that Korean courts, like
American courts, are likely to recognize an exception to
sovereign immunity for acts of terrorism committed against
international law.

IBK's experts have also pointed out that the plaintiffs'
experts made significant errors in their interpretation of
applicable provisions of Korean law.  For instance, while the
plaintiffs' experts argue that the plaintiffs' judgments are
unlikely to be fully recognized by a Korean court because they
include a substantial award of punitive damages, the purported
provision of Korean law upon which the plaintiffs' experts rely
in forming that conclusion is actually a proposed bill that was

not adopted by the Korean legislature.[8]  In sum, the analysis set forth by the parties' respective experts indicates that the plaintiffs would likely be able to enforce their U.S. judgments in Korea.  Korea is therefore an adequate alternative forum.

Additionally, the plaintiffs argue that Korea is not an alternative forum because their claims against IBK may be time barred under Korean law.  IBK, however, has represented to the Court that it will waive all statute of limitations defenses it could assert in Korea, and the Court will condition dismissal on such a waiver.  The potential for a statute of limitations defense is thus no basis for concluding that Korea is an inadequate forum.

III. Private and Public Interests

At the final stage of the <u>forum non conveniens</u> analysis, the Court must consider whether the applicable private and public interest factors support dismissal.  Private interest factors are those that involve the "convenience of the litigants" and include

> the relative ease of access to sources of proof;
> availability of compulsory process for attendance of
> unwilling, and the cost of obtaining attendance of
> willing, witnesses . . . and all other practical

---

[8] Moreover, even if the plaintiffs' potential recovery in Korea is less than the full value of their U.S. judgments because Korean law does not recognize punitive damages, "the fact that a plaintiff might recover less in an alternate forum does not render that forum inadequate."  <u>Figueiredo</u>, 665 F.3d at 391.

problems that make trial of a case easy, expeditious
and inexpensive.

Iragorri, 274 F.3d at 73-74 (quoting Gulf Oil Corp. v. Gilbert,
330 U.S. 501, 508 (1947)).

The relevant public interest factors include

the administrative difficulties flowing from court
congestion; the local interest in having localized
controversies decided at home; the interest in having
the trial of a diversity case in a forum that is at
home with the law that must govern the action; the
avoidance of unnecessary problems in conflict of laws,
or in the application of foreign law; and the
unfairness of burdening citizens in an unrelated forum
with jury duty.

Gross, 386 F.3d at 233 (quoting Reyno, 454 U.S. at 241 n.6).

These private interest factors weigh in favor of litigating
in Korea.  As described above, the majority of both the
documentary evidence and percipient witnesses in this case is
thousands of miles away in Korea.  Litigating in New York under
such circumstances would be far from "easy, expeditious and
inexpensive."  Iragorri, 274 F.3d at 73-74.

The public interest factors also weigh against permitting
this case to proceed in New York.  For one, New York has no
local interest in deciding this case because this case has
almost no connection to New York.  The underlying facts giving
rise to the plaintiffs' litigation against Iran stem from
overseas terrorist attacks, and their U.S. judgments were
entered in the District of Columbia.  As alleged in the

plaintiffs' complaint, most of IBK's conduct exposing it to liability occurred in Korea and other foreign countries. Indeed, the primary connection between the facts of this case and New York seems to be the allegation that IBK passed Iranian funds through correspondent bank accounts in New York.  But the coincidental involvement of bank accounts in New York, a global financial hub, is not enough to make this a New York controversy.  As the New York Court of Appeals has noted, New York's "interest in the integrity of its banks . . . is not significantly threatened every time one foreign national, effecting what is alleged to be a fraudulent transaction, moves dollars through a bank in New York," and the tangential involvement of the New York banking system "is not a trump to be played whenever a party . . . seeks to use [New York] courts for a lawsuit with little or no apparent contact with New York." Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co., 12 N.E.3d 456, 460 (N.Y. 2014) (citation omitted).

Given the minimal connection between New York and the issues in this case, New York has almost no interest in seeing it decided here, and it makes little sense to burden a New York court and jury with it.  Korea, by contrast, has a strong interest in hearing this case, because it involves alleged

misconduct by a government-sponsored Korean bank that in large part occurred in Korea.

Additionally, there is a possibility that even if this action were to proceed in New York, this Court would be required to apply Korean law to the plaintiffs' claims.  New York's choice of law rules would be used to determine the applicable substantive law in this case.  Kinsey v. New York Times Company, 991 F.3d 171, 176 (2d Cir. 2021).  IBK argues that an application of New York choice of law rules dictates the application of Korean substantive law in this case, while the plaintiffs contend that New York substantive law will apply. This dispute in and of itself weighs in favor of dismissal, since "the public interest factors point towards dismissal where the court would be required to untangle problems in conflict of laws, and in law foreign to itself."  Reyno, 454 U.S. at 251 (citation omitted).

IV.  Conditional Dismissal

This action is appropriately dismissed on the grounds of forum non conveniens.  The plaintiffs' choice of forum is entitled to minimal deference, IBK has shown that Korea is an adequate alternative forum where this litigation may proceed, and relevant private and public interest factors support dismissal.  As in Owens, however, this Court will require

conditional dismissal in order to protect the rights of the plaintiffs and to ensure that their claims may be heard on the merits in Korea.  2021 WL 638975, at *6 (quoting <u>Blanco v. Banco Indus. de Venezuela, S.A.</u>, 997 F.2d 974, 984 (2d Cir. 1993)). The parties shall submit an agreement to litigate in Korea, which shall include a commitment by IBK to accept service in Korea and waive any jurisdictional or statute of limitations defense.

## <u>Conclusion</u>

IBK's April 13 motion to dismiss on the grounds of <u>forum non conveniens</u> is conditionally granted.  The parties shall file an agreement to litigate in Korea, containing the aforementioned terms, by July 28, 2021.  Upon filing of that agreement, judgment will be entered for IBK and this case will be closed.

Dated:   New York, New York
         July 14, 2021

_____
DENISE COTE
United States District Judge